IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 15, 2001 Session

## STATE OF TENNESSEE v. GONZALO MORAN GARCIA

**Direct Appeal from the Criminal Court for Davidson County**
**No. 99-C-2220      Steve Dozier, Judge**

---

**No. M2000-01760-CCA-R3-CD - Filed February 20, 2002**

---

The appellant, Gonzalo Moran Garcia, appeals his conviction by a jury in the Davidson County Criminal Court of one count of possession of one thousand grams or more of methamphetamine with intent to deliver, a class A felony.  He raises the following issues for our review: (1) whether the trial court erred in denying his pre-trial motion to suppress; (2) whether the trial court erred in admitting at trial the testimony of Daniel A. Rosales, an officer employed by the Houston Police Department in Texas; (3) whether the evidence underlying the appellant's conviction is sufficient; and (4) whether the trial court erred in rejecting his proposed jury instructions.  Following a thorough review of the record and the parties' briefs, we reverse the judgment of the trial court and remand this case to the trial court for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Reversed and Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JERRY L. SMITH J., joined. JOHN EVERETT WILLIAMS, J; filed a dissenting opinion.

Richard McGee, James Holt Walker, and Bobby Ballinger, Nashville, Tennessee, for the appellant, Gonzalo Moran Garcia.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and John Zimmerman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

### I.  Factual Background

On September 24, 1999, a Davidson County Grand Jury returned an indictment charging the appellant with one count of possession of one thousand grams or more of methamphetamine with intent to deliver.  The indictment arose from the traffic stop on May 9, 1999, of the vehicle that the appellant was driving on Interstate Highway 24 in Davidson County and the subsequent seizure by police of approximately 40.1 pounds, or more than eighteen thousand grams,

of methamphetamine. Following his indictment, the appellant filed a motion to suppress any evidence obtained during or as a result of the traffic stop. The trial court conducted a hearing on the appellant's motion on December 10, 1999.

### A. Suppression Hearing

At the suppression hearing, the State presented the testimony of Debra Kohl,[1] an officer with the Metropolitan Nashville Police Department. She testified that she had been employed by the police department for eleven years and was currently assigned to the Highway Interdiction Unit of the Twentieth Judicial District Drug Task Force. Prior to working with the Highway Interdiction Unit, she was a patrol officer for several years, which position required training in the investigation and apprehension of drunk drivers. She joined the Highway Interdiction Unit eight months prior to the traffic stop in this case and, due to her new assignment, attended two conferences on illegal drug interdiction that were organized by the United States Customs Service and the Drug Enforcement Administration (hereinafter the DEA). Additionally, she worked with the United States Customs Service in El Paso, Texas, for one week. Finally, she attended additional training conferences in Nashville and Memphis on illegal drug interdiction.

Kohl related that, on May 9, 1999, at approximately 10:50 p.m., she was traveling on Interstate Highways 40 and 24 in a marked patrol car when she noticed the appellant's vehicle traveling in the right lane. Her attention was drawn to the appellant's vehicle because it swerved onto the line demarcating the right boundary of its lane. Kohl slowed her patrol car and began to monitor the appellant's vehicle.

As the appellant's vehicle proceeded on Interstate Highway 24 toward Chattanooga, it continued to weave within its lane. Kohl opined that the driver of the vehicle was driving carelessly, recalling:

> The vehicle would drive in its lane - - it stayed in its lane of traffic; but, as the vehicle was going in its lane of traffic, it would go to the left-lane marker, then it would swerve over to the right-lane marker, then it would swerve over to the left-lane marker.
>
> And I became concerned for his safety, as well as the safety of other motorists, and decided to stop the vehicle, at that point in time.

Kohl testified that she suspected, among other possibilities, that the driver of the vehicle was intoxicated.

After stopping the appellant's vehicle, Kohl approached the passenger's side on foot. Peering through the front, passenger's side window, she motioned for the driver to open the window. When the appellant complied, Kohl identified herself and asked the appellant to join her at the rear of his vehicle. The appellant, however, did not respond, and Kohl inquired in English whether he spoke Spanish. The appellant responded affirmatively, whereupon Kohl instructed him in Spanish

----

[1] Officer Kohl's first name is spelled "Deborah" in the trial transcript.

to get out of his car and come to the rear of his vehicle. Kohl asserted at the suppression hearing that she speaks Spanish with sufficient fluency to "get through a traffic stop."

The appellant followed the officer's instructions, and Kohl informed him in Spanish that she was an officer with the Metropolitan Nashville Police Department and had stopped his vehicle because he was weaving within his lane. The appellant repeated in English, "I was weaving." Accordingly, Kohl continued the conversation in English. She recalled at the suppression hearing that the appellant was appropriately responsive to all her inquiries in English.

Although at this point during the traffic stop Kohl had not observed any signs that the appellant was intoxicated, she was not yet satisfied that he was free of any impairment. Accordingly, she inquired whether the appellant had been drinking alcohol and, upon his denial, inquired if he was tired. The appellant conceded that he was tired, admitting that he had been driving since he left Los Angeles, California, on the previous day, pausing only briefly at a "few rest stops" to sleep. Kohl asked the appellant about his destination, and he indicated that he was traveling to Georgia. Kohl recalled:

> And I said, "Where in Georgia?".
> He said he didn't know.
> I said, "Well, how are you supposed to know where you supposed to go in Georgia?".
> And he said, when he got close to the - - to the area, he had a pager number he was supposed to call.
> I asked him who the pager number belonged to.
> And he said it was his cousin, Miguel's.
> I asked if he knew where Miguel lived.
> And he said, "No."
> Then I asked him where he was going to stay at.
> And he said he didn't know where he was going to stay; he thought a hotel, maybe.
> Then I asked him if the vehicle was his vehicle.
> And he said, no, that it belonged to his cousin.
> I asked him what his cousin's name was.
> And he told me, "Well, he's not really my cousin."
> So, then I said, "Well, who is he?".
> "He's my friend."
> So, I said, "Well, is he your cousin or is he your friend?".
> He - - "Well" - - he said, "Well, he's a friend who's like a cousin."
> I said, "Okay. What's your cousin's name?".
> And he gave me a name.
> And I said, "Well, that's nice of him to let you borrow the car on this trip."
> He said, Well, he's not really my friend."
> I said, "Well, then who is he?".
> He said, "He's a friend of my friend at work."

. . . .
> I said, "Well, what kind of work do you do?".
> And he said that he did hardwood-floor work.
> At that point in time, I asked him if he had the registration, and he
> went to the glove box and retrieved the registration for me.

Kohl further indicated at the suppression hearing that she requested the appellant's driver's license after inquiring concerning the length of the appellant's journey and prior to inquiring concerning the ownership of the vehicle in which the appellant was driving. Upon observing the appellant retrieve his driver's license from his wallet, Kohl was satisfied that the appellant was not intoxicated. As to her subsequent acquisition of the vehicle registration document, Kohl was unable to recall at the suppression hearing whether the name recorded on the document was the same as the name provided by the appellant and identified by him as belonging to the vehicle's owner. Kohl testified that she did, however, confirm that the registration matched the vehicle's license plate. Moreover, after obtaining both the appellant's driver's license and his vehicle registration document, she asked the appellant about his driving record and his arrest record. With respect to the latter, the appellant informed Kohl that he had once been arrested for driving under the influence.

Having examined the appellant's driver's licence and vehicle registration document, Kohl explained to the appellant that she was going to issue him a warning citation. Additionally, upon inquiry by the appellant, she provided him with directions to a location at which he could park his car and sleep. Finally, she instructed the appellant to wait inside his car while she completed the necessary paperwork.

Retaining the appellant's driver's license and vehicle registration document, Kohl returned to her patrol car. Inside the patrol car, she radioed a fellow officer, Dean Hunter, and asked that he transport a drug-detection dog to the scene of the traffic stop. She then filled out a warning citation for violation of "lane restrictions." She also prepared a "Consent to Search" form written in Spanish before returning to the appellant's vehicle.

Upon approaching the appellant once again, Kohl instructed him to get out of his vehicle and, upon his compliance, returned to him his driver's license and vehicle registration document. She also gave to him the warning citation, thanked him, and informed him, "The stop's complete." The appellant began walking back to his vehicle, and she turned to begin walking toward her patrol car. She paused, however, and asked the appellant if she could ask him several questions. The appellant returned to her location, and she asked him if he had any weapons in his vehicle. He responded, "No." She then asked him if he had any illegal drugs in the vehicle. Kohl recalled:

> At that point in time, his demeanor changed. He gave me a - - a
> nervous, laughing, "No." And he - - he became fidgety. You could
> see him scratching on his back. He was nervous, and you could
> literally see his Adam (sic) apple, a nervous sign, bobbing up and
> down, which I was talking to him, which, to me, is an indicator of
> some type of deception.

Following the above exchange, Kohl asked the appellant if she could search his vehicle. He quickly offered to open his trunk for her inspection, but Kohl declined the appellant's offer and instead asked him if he was able to read in Spanish. Upon receiving an affirmative reply, she asked him to read the Spanish "Consent to Search" form that she had prepared. Kohl testified, "[A]s he read, you could follow his finger going along each sentence, which, to - - me, demonstrated that he was actually reading the statement." The consent form contained advice concerning the appellant's right to refuse consent to a search of his vehicle, his right to limit any consent to certain areas of his vehicle, and his right to revoke his consent at any time. Nevertheless, the appellant signed the consent form, agreeing to a search of his vehicle without imposing any limitations.

Meanwhile, Officer Dean Hunter had arrived at the scene of the traffic stop with a drug-detection dog. Following the appellant's consent to a search of his vehicle, Hunter permitted the dog to sniff the vehicle. The dog signaled the presence of drugs in both the driver's side and the passenger's side of the vehicle. Accordingly, Hunter, Kohl, and a third officer began a search of the vehicle.

During the search, Hunter noticed that the vehicle's rocker panels[2] had been freshly painted. He therefore procured a drill and used the tool to remove the screws "that hold the rubber or plastic molding over the top of [one of] the rocker panels." Upon removing the "rubber or plastic molding," Hunter inserted a small metal probe into pre-existing screw holes, meeting with some resistance. He then drilled into the pre-existing holes "[a]nd . . . started coming up with some terry - - white-terry-cloth material, like a bath-towel material." At this point, Kohl retrieved a "buster" or density meter from her patrol car and measured the density of the rocker panels, receiving unusually high measurements. Due to the high measurements, the officers drilled new holes in the rocker panels. In addition to the terry cloth material, "a pinkish-brown-type material . . . came out on the drill bit." Kohl recounted that they tested the substance for the presence of cocaine but received negative results. Nevertheless, "we knew something was there that didn't belong there." Finally, the officers broke the rocker panels, revealing "duct-taped bundles." Kohl arrested the appellant, and subsequent testing established that the bundles contained approximately twenty kilograms of methamphetamine.

The State also introduced into evidence at the suppression hearing a videotape of Kohl's traffic stop of the appellant. The videotape does not contain an audio component. Kohl explained that, following the traffic stop, she discovered that the battery powering the audio equipment was dead.

In addition to Kohl's testimony and the videotape of Kohl's traffic stop of the appellant, the State presented the testimony of Officer Dean Hunter of the Metropolitan Nashville

---

[2]A rocker panel is "the portion of the body paneling of a vehicle that is situated below the doorsills of the passenger compartment." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1965 (1993).

Police Department.[3] Hunter related that he had been a police officer for approximately twenty years and had been a "canine officer" for approximately thirteen years. According to Hunter, he had been assigned two different drug-detection dogs during the course of his career as a canine handler; moreover, he was certified by the United States Police Canine Association (hereinafter UPCA) as a trainer of drug-detection dogs. Hunter testified that he was currently assigned a drug-detection dog named Lou. Prior to the traffic stop in this case and in accordance with the standards of the UPCA, Lou had successfully completed a ten-week training course in drug detection. Additionally, Lou underwent continuing training a minimum of eight hours each week.

Hunter further testified that he was currently assigned to the Highway Interdiction Unit of the Twentieth Judicial District Drug Task Force and, on May 9, 1999, was patrolling the interstates with Lou. Hunter confirmed that he and Lou assisted Kohl during the traffic stop of the appellant's vehicle and that Lou alerted the officers to the presence of illegal drugs in the vehicle four times, three times on the driver's side of the vehicle and once on the passenger's side. During the ensuing search of the appellant's vehicle, Hunter noticed that the vehicle's rocker panels had been freshly painted. He explained at the suppression hearing that he noticed the freshly painted rocker panels due to his past employment in an automobile body repair shop. Hunter carefully examined the entire vehicle and did not see any other areas where the vehicle had been re-painted.

As a result of Hunter's discovery, the officers removed the plastic molding covering one of the rocker panels, and Hunter inserted a metal probe into pre-existing holes. Hunter recalled, "I was meeting resistance; and, when I'd take the probe, because it was a sharp object on the end, and push [further] . . . , I could go through the resistance and I could go to the bottom of the rocker panel." Hunter noted that a rocker panel is normally hollow. Accordingly, he concluded that "something was in the rocker panel, that wasn't necessarily supposed to be there." Further investigation revealed packages concealed inside the rocker panel.

Finally, the State introduced into evidence without objection a certified copy of Metropolitan Nashville Code § 12.68.170, entitled "Careless driving." See Tenn. R. Evid. 202(b). The ordinance provides:

> A. Every person operating a vehicle upon the streets within the metropolitan government, or upon any private road or driveway or parking area, shall drive the same in a careful and prudent manner, having regard for the width, grade, curves, corners, traffic and use of these streets and private areas, and all other attendant circumstances, so as not to endanger the life, limb or property of any person. Failure to drive in such manner shall constitute careless driving and a violation of this chapter.

By means of an interpreter, the appellant testified at the suppression hearing for the sole purpose of establishing his standing to contest the search of the vehicle in which he was driving

---

[3]Officer Hunter is identified as "Wilford Rodene Hunter" in the trial transcript.

on the night of the traffic stop. He asserted that the owner of the vehicle had given him permission to use the vehicle, providing him with the keys. The appellant explained that the owner was willing to loan him the vehicle because the owner was on vacation in Mexico. According to the appellant, the owner was aware of the appellant's planned trip to Georgia. The appellant concluded that, prior to the traffic stop at issue in this case, he had been in exclusive possession of the vehicle for three days.

Following the suppression hearing, on February 8, 2000, the trial court denied the appellant's motion to suppress. As relevant to this appeal, the court concluded:

> [T]he seizure involving the defendant was based upon reasonable suspicion; the defendant has standing to challenge the subsequent search of the vehicle; the initial search of the vehicle was based upon consent; [and] the extended search of the vehicle's exterior rocker panels was based upon consent and further probable cause . . . .

### B. Trial

The appellant's case proceeded to trial on May 15, 2000. As at the suppression hearing, the State presented the testimonies of both Officer Kohl and Officer Hunter. Hunter's testimony at trial was substantially identical to his testimony at the suppression hearing. Kohl also reiterated much of her testimony at the suppression hearing but added a description of her duties as a member of the Highway Interdiction Unit:

> Basically, what we do is, we sit on the side of the interstate and monitor the flow of traffic. And, we see traffic violations that occur, we - - uh - - pull the violator and the vehicle over and issue them a warning ticket, speeding ticket. And, uh - - from there, sometimes we get stolen vehicles; we get fugitives from justice; we get people with weapons; uh - - we get people with narcotics, just an array of different things.

She related to the jury that the location of the traffic stop in this case "is one of the busiest []sections of the interstate system in [Nashville]." She asserted that she stopped the appellant's vehicle because, in addition to suspecting the appellant of intoxication, she was concerned that "possibly he was sleepy, was getting tired and maybe he's gonna fall asleep at the wheel."

Kohl also added at trial that she was unable to see inside the appellant's vehicle prior to making the traffic stop because the windows of the vehicle were tinted. Only when she stopped the appellant's vehicle and the appellant rolled down his window was she able to see both the appellant and the condition of the interior of his vehicle. In particular, she noted that the interior was littered with empty Coca-Cola cans, empty juice bottles, and half-eaten sandwiches. The appellant explained to her that he had traveled almost nonstop from California and intended to visit his cousin in Georgia for a couple of weeks. Kohl recalled that, notwithstanding the appellant's claim that he was pausing briefly at rest stops and napping in his vehicle, there were no blankets or pillows in the vehicle.

In addition to the appellant's responses to her questions concerning his destination and the ownership of his vehicle, the nonstop nature of the appellant's journey, reflected by the condition of the interior of his vehicle, suggested to Kohl the possibility that the appellant was engaged in the transportation of illegal drugs. Moreover, a can of air freshener was located on the center console of the vehicle, and Kohl could detect the odor of air freshener inside the vehicle, albeit the odor was "very minute." Kohl observed that air freshener is "commonly used by people hauling drugs to mask the odor of the narcotic that they're hauling." According to Kohl, her suspicion that the appellant was transporting illegal drugs prompted her radio call to Officer Hunter and her preparation of a Spanish "Consent to Search" form.

Kohl emphasized at trial that, upon returning to the appellant his driver's license and vehicle registration document and issuing a warning citation, she "told him to have a safe trip and the stop is complete"; she allowed him to begin walking toward his vehicle; and she turned to begin walking toward her patrol car. Kohl recounted, "[A]fter he started back to his car and I had started back to mine, then, I said, 'Excuse me. Can I ask you a couple of questions?' And, so, he walks over to where I'm at, he shakes his head, and he says, 'Yes.'"

During the ensuing encounter, Kohl's suspicion of the appellant was heightened even further when the appellant immediately offered to open his trunk in response to her request to search his vehicle. She noted, "[I]n the past when I found drugs that weren't in the trunk, people always want you to look in the trunk. And, to me, they're trying to divert my attention away from where they are. They want me to look in the trunk." That having been said, she also testified that, of the several hundred traffic stops that she performed while working with the Twentieth Judicial District Drug Task Force, approximately ten traffic stops resulted in the seizure of drugs.

Kohl also clarified at trial that Hunter and his drug-detection dog Lou arrived as she was seated in her patrol car completing the appellant's warning citation. Hunter and Lou remained in their patrol car while Kohl requested and obtained the appellant's consent to search his vehicle. Kohl recalled that the appellant could see Hunter's patrol car parked behind her own, but she was uncertain if the appellant was aware of the presence of a drug-detection dog inside Hunter's patrol car. A third officer arrived after Lou had already signaled the presence of illegal drugs in the appellant's vehicle.

During the officers' search, the appellant stood approximately fifteen feet away from his vehicle and was able to observe their activities. Prior to examining the rocker panels, the officers detached the seats and lifted carpeting inside the passenger compartment of the vehicle. Additionally, the officers climbed inside the trunk, lifted the carpeting, and removed the spare tire. Finally, the officers examined the vehicle's engine, removing the top of the air filter. At no time prior to the discovery of the bundles of methamphetamine did the appellant express any objection to the scope of the officers' search. The officers ultimately removed bundles of methamphetamine from rocker panels on both the driver's side and the passenger's side of the appellant's vehicle.

Following the appellant's arrest, Kohl questioned him concerning his knowledge of the drugs. Notwithstanding the appellant's claim that he spoke "[a] little bit" of English and Kohl's

-8-

limited proficiency in Spanish, Kohl obtained the assistance of a Spanish-speaking officer in both advising the appellant of his <u>Miranda</u> rights and questioning the appellant. By means of the interpreter, the appellant denied any knowledge of the drugs. However, in contrast to his earlier statements to Kohl, the appellant now acknowledged that he was traveling to "Forest Park" in Georgia. The appellant also provided Kohl, from memory, the pager number belonging to his cousin Miguel, whom he had intended to visit in Georgia. The appellant declined Kohl's invitation to "roll over, meaning, . . . do a control delivery, meaning . . . take the dope on to where it needed to go, as if he hadn't been intercepted or stopped." Kohl noted that the appellant was not carrying large amounts of currency or a pager at the time of his arrest. He did have in his possession an America West Airlines ticket stub marked "IAH" and a business card belonging to the managers or owners of a Super 8 Motel in Houston, Texas.

After questioning the appellant, Kohl telephoned the pager number provided by the appellant. She discovered that the number was, in fact, assigned to a residence rather than a pager. A woman answered the telephone and informed Kohl that there was no one named Miguel living at that residence. Kohl also investigated the license plate number of the vehicle driven by the appellant and the vehicle registration. She discovered that, although the vehicle registration number was assigned to a Fernandez Orosco Efrain in Los Angeles, California, the license plate number was assigned to a Manuel Gonzales in the same city.

In addition to the testimonies of Kohl and Hunter, the State presented the testimony of Kathy Carman, a chemist employed by the Tennessee Bureau of Investigation (hereinafter the TBI) at the TBI Crime Laboratory. She related that she performed testing on the substance contained in each of the twenty-eight bundles seized by police from the vehicle driven by the appellant on May 9, 1999. She discovered that the bundles contained methamphetamine and weighed a total amount of 40.1 pounds or a little more than eighteen thousand grams.

The State next presented the testimony of Daniel Rosales, an officer employed by the Houston Police Department in Texas. He testified that he had been a police officer for seventeen years and had participated in drug investigations for twelve years. He noted that he was currently assigned to a federal DEA task force known as the "High Intensity Drug Trafficking Area Task Force" (hereinafter the HIDTA) and had been so assigned for six years. He related that the mission of HIDTA was to investigate criminal organizations dealing in illegal drugs. During the course of his assignment to HIDTA, he had investigated approximately forty or fifty different criminal organizations dealing in marijuana, cocaine, heroin, methamphetamine, and various other, synthetic drugs. The investigations spanned many areas of the country, including Texas, Tennessee, California, New York, New Jersey, Illinois, and Missouri.

As to his specific tasks, Rosales related that his job entailed working undercover on one occasion as a buyer for an organization dealing in heroin and methamphetamine. He also participated in the execution of more than five hundred search warrants. Additionally, he noted, "I've interviewed people that were selling drugs on the corners; I've interviewed people that are transporting drugs; I've interviewed the top of an organization. At one point or another, I've

interviewed pretty well every level of an organization." In particular, he had interviewed at least fifty drug couriers.

Based upon his experience, Rosales testified concerning the care with which criminal organizations select their drug couriers:

> The transportation is - - is - - you're gonna be getting someone that is trusted within the organization. I mean, sometimes it's family, sometimes it's a referral from a friend within the organization. If - - if I recommend this lady right here and I'm in the organization and she loses a load, then, I'm held responsible. So, there is never going to be anybody that's not trusted within the organization.

Rosales observed that, sometimes, organizations further ensure the delivery of drugs by threatening the couriers and by requiring that couriers periodically call a cellular telephone or a pager, using codes in order to communicate the progress of their journey. He noted that the most common mode of transporting illegal drugs within the United States of America (hereinafter the USA) is automobile or truck.

Rosales further related to the jury that the street value of methamphetamine in Houston is one hundred dollars per gram, albeit he acknowledged that the street value in Houston is "the higher retail end." Accordingly, the street value of the methamphetamine seized from the appellant would be approximately 1.8 million dollars. Rosales noted that a courier's fee is based upon the quantity of drugs transported. He remarked that the quantity of drugs at issue in this case was even greater than the quantity generally transported by the organizations that he investigated.

Finally, Rosales examined the America West Airlines ticket stub found in the appellant's possession at the time of his arrest. He confirmed that America West Airlines operates flights to and from Houston, Texas. Moreover, he testified that the initials "IAH" written on the ticket stub signifies "Intercontinental Airport of Houston."

The appellant testified on his own behalf through an interpreter. He informed the jury that he was born in Guatemala, where he attended school through the sixth grade. He came to the USA on February 22, 1989, when he was eighteen years old. His parents and five of his brothers still resided in Guatemala, but one of his brothers and several uncles and cousins had immigrated, like him, to the USA. The appellant's native language is Spanish, although he understands "[s]ome words" in English.

The appellant further informed the jury that he was currently married to a woman from Mexico named Gurdaluepe Polideo and had three children, the youngest having been born only two months before the instant offense. Prior to this offense, the appellant worked full-time installing and re-finishing hardwood floors. He was an independent contractor and earned a net income of approximately twenty-five thousand dollars each year. Nevertheless, he was able to save sufficient funds to satisfy in cash hospital bills stemming from the birth of his youngest child. He noted that, although his family did not possess health insurance, he "found a cheap program for the delivery."

As to the instant offense, the appellant related to the jury that he and his wife had also saved funds in preparation for a trip to visit his cousin Miguel Avila in Georgia. Accordingly, the appellant had five hundred dollars with him at the time of Kohl's traffic stop of his vehicle, in addition to funds in his bank account. The appellant asserted that both he and his wife had been planning the trip for several months, but his wife ultimately decided that she would not accompany him due to the recent birth of their youngest child. Nevertheless, the appellant decided to visit his cousin as planned. He asserted that he knew his cousin well, although he denied that he had ever used his cousin's "pager" number, having memorized the number solely for the purpose of his trip to Georgia. According to the appellant, he intended to stay in Georgia for approximately one and one-half or two weeks.

The appellant additionally testified that a co-worker and friend named Efrain Orosco loaned him a car three days prior to his trip. Specifically, Orosco asked the appellant to care for his car while Orosco was on vacation for one month in Mexico. Orosco was also a friend of the appellant's cousin, Miguel, and was aware of the appellant's planned trip to Georgia. Accordingly, notwithstanding his ownership of a 1994 Chevrolet Suburban, the appellant decided to use Orosco's 1990 Pontiac Bonneville for the lengthy trip. The appellant noted that he had exclusive control of Orosco's vehicle during Orosco's absence. He denied that Orosco ever asked or required that the appellant drive the Pontiac Bonneville to Georgia.

The appellant only partly disputed Kohl's account of the traffic stop of his vehicle on Interstate Highway 24 in Davidson County. He denied ever stating to Kohl that he did not know his destination in Georgia. Moreover, he denied ever stating that a cousin owned the vehicle that he was driving. Finally, he denied ever offering to open his trunk for Kohl's inspection following her request to search his vehicle. However, he conceded that Kohl only requested his permission to search his vehicle after issuing him a warning citation and informing him that the stop was over and that he was free to leave. He confirmed that, prior to obtaining his consent, Kohl showed him the "Consent to Search" form written in Spanish. Finally, he acknowledged that he consented in writing to the search of his vehicle with a full awareness of his right to refuse consent and his right to revoke his consent at any time.

The appellant also presented the testimony of his wife, Gurdaluepe Moran Polideo Garcia. She stated that her husband was an excellent worker, specializing in hardwood floors, and that he was able to meet all the financial needs of his family. She noted that, other than his trip to Georgia, the appellant had only taken vacations with her, driving with her to visit family in Bull Head City, Arizona. She denied that she or her husband had ever flown to Arizona or to Houston, Texas.

The appellant next presented the testimony of Miguel Bouquet. Bouquet testified that he lived in Venice, California, and owned a business known as Bouquet Floors. Bouquet noted that he had owned his business for approximately twelve or fourteen years, and the appellant had worked for him approximately twenty or twenty-five times during the past four or five years. Bouquet asserted that the quality of the appellant's work was "very good," and the appellant was reliable.

Finally, the appellant presented the testimony of his nephew, Rubin Munez Palidio. Palidio testified that he lived in Bull Head City, Arizona. He observed that his uncle was a good man and had always treated others well. Palidio further related that he had previously worked with his uncle, describing his uncle as a hard worker. Finally, he denied that his uncle maintained a "luxurious" lifestyle, asserting that his uncle's lifestyle was "normal."

At the conclusion of the appellant's trial, the jury found the appellant guilty of possession of one thousand grams or more of methamphetamine with intent to deliver. The trial court conducted a sentencing hearing on June 30, 2000, at the conclusion of which it imposed a sentence of twenty years incarceration in the Tennessee Department of Correction. The appellant challenges his conviction in this appeal.

## II. Analysis
### A. Trial Court's Denial of Appellant's Motion to Suppress

The appellant first contends that the trial court erred in denying his pre-trial motion to suppress any evidence obtained during or as a result of Kohl's traffic stop of his vehicle. His argument is three-fold: First, relying largely upon our supreme court's decision in State v. Binette, 33 S.W.3d 215 (Tenn. 2000), the appellant argues that Officer Kohl did not possess a reasonable suspicion at the time of the traffic stop that he had committed, was committing, or was about to commit a criminal offense. Second, the appellant argues that, even assuming the legality of the traffic stop at its inception, the scope of the stop soon exceeded its justification. Third and finally, the appellant argues that the search of his vehicle exceeded the scope of his consent.

In response, the State seeks to distinguish Binette from the instant case and broadly argues that "Officer Kohl was justified in stopping the [appellant] to ascertain his condition, as a matter of public safety." Second, the State disputes the appellant's argument that the scope of the traffic stop exceeded its justification. Finally, the State argues that the police officers' search of the appellant's vehicle was within the scope of the appellant's unqualified consent and was further warranted by the drug-detection dog's positive indication of the presence of illegal drugs in the vehicle.

**i.**

When reviewing a trial court's ruling on a motion to suppress evidence obtained by police pursuant to a warrantless search or seizure, this court is obliged to uphold the trial court's findings of fact unless the evidence preponderates otherwise. State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998); State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); State v. Ashworth, 3 S.W.3d 25, 29 (Tenn. Crim. App. 1999). In this regard, our supreme court has observed:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is [therefore] entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence.

Odom, 928 S.W.2d at 23. The court has recently reaffirmed that "the standard of appellate review for findings of fact at a suppression hearing is that articulated by this Court in Odom." State v. Walton, 41 S.W.3d 75, 81 n.3 (Tenn. 2001). However, it has also expressed the following qualification: "[W]hen a trial court's findings of fact at a suppression hearing are based on evidence that does not involve issues of credibility, a reviewing court must examine the record de novo without a presumption of correctness." Binette, 33 S.W.3d at 217; see also State v. Munn, 56 S.W.3d 486, 494 (Tenn. 2001). In any event, an appellate court's review is not limited to the transcript of the suppression hearing but extends to the entire record of proceedings, including the trial transcript. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998). Moreover, an appellate court will also review de novo the trial court's application of the law to factual findings. State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); Keith, 978 S.W.2d at 864.

**ii.**

Turning first to the legality of the traffic stop at its inception, both the Fourth Amendment to the United States Constitution and Article I, Section 7 of the Tennessee Constitution protect citizens against unreasonable searches and seizures conducted by law enforcement officers. In essence, "[t]he purpose of the Fourth Amendment and article I, § 7 is to 'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" Munn, 56 S.W.3d at 494; see also State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997)(observing that "'article I, section 7 is identical in intent and purpose with the Fourth Amendment,'" and federal cases interpreting the Fourth Amendment should be regarded as particularly persuasive). Accordingly, under both the United States and Tennessee constitutions, searches and seizures conducted without a warrant are presumptively unreasonable subject to a few carefully defined exceptions. See Coolidge v. New Hampshire, 403 U.S. 443, 454-455, 91 S. Ct. 2022, 2032 (1971); Keith, 978 S.W.2d at 865; State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997). Because stopping an automobile and detaining its occupants unquestionably constitute a seizure, Wren v. United States, 517 U.S. 806, 809-810, 116 S. Ct. 1769, 1772 (1996); United States v. Sharpe, 470 U.S. 675, 682, 105 S. Ct. 1568, 1573 (1985); Delaware v. Prouse, 440 U.S. 648, 653, 99 S. Ct. 1391, 1396 (1979); Binette, 33 S.W.3d at 218; Yeargan, 958 S.W.2d at 630; State v. Pulley, 863 S.W.2d 29, 30 (Tenn.1993), it follows that, when the State seeks to introduce in a criminal trial evidence obtained as a result of the warrantless stop of an automobile, the State carries the burden of demonstrating by a preponderance of the evidence the applicability of an exception to the warrant requirement, Keith, 978 S.W.2d at 865; Yeargan, 958 S.W.2d at 629.

One exception to the warrant requirement is an arrest based upon probable cause to believe that a crime has been or is being committed. Beck v. Ohio, 379 U.S. 89, 91, 85 S. Ct. 223, 225-226 (1964); Henning, 975 S.W.2d at 300; see also Tenn. Code Ann. § 40-7-103 (1997). "Probable cause exists where 'the facts and circumstances within the[] [officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." Brinegar v. United States, 338 U.S. 160, 175-176, 69 S. Ct. 1302, 1310-1311 (1949)(alterations in original)(quoting Carroll v. United States, 267 U.S. 132, 162, 45 S. Ct. 280, 288 (1925)). Probable cause will justify an arrest for even very minor criminal offenses committed in an officer's presence. Atwater v. City of Lago Vista, 532 U.S. 318, __, 121 S. Ct. 1536, 1557 (2001); State v. Walker, 12

S.W.3d 460, 464 (Tenn. 2000). However, in Tennessee, the constitutionality of such arrests will depend upon the officer's compliance with Tenn. Code Ann. § 40-7-118 (1997). Walker, 12 S.W.3d at 464-468.

Additionally, in Terry v. Ohio, 392 U.S. 1, 20, 88 S. Ct. 1868, 1879-1880 (1968), the United States Supreme Court indicated that a warrantless seizure short of an arrest might be justified by something less than probable cause. This proposition was subsequently confirmed by the United States Supreme Court in Adams v. Williams, 407 U.S. 143, 145-146, 92 S. Ct. 1921, 1923 (1972), and extended to investigatory stops of automobiles in United States v. Brignoni-Ponce, 422 U.S. 873, 881, 95 S. Ct. 2574, 2580 (1975); see also United States v. Hensley, 469 U.S. 221, 226, 105 S. Ct. 675, 679 (1985). Thus, a police officer may stop an automobile based upon reasonable suspicion, supported by specific and articulable facts, that the occupants of the automobile have committed, are committing, or are about to commit a criminal offense. Binette, 33 S.W.3d at 218; State v. England, 19 S.W.3d 762, 766 (Tenn. 2000); Keith, 978 S.W.2d at 865 (citing, among other authorities, United States v. Cortez, 449 U.S. 411, 417, 101 S. Ct. 690, 694 (1981), and Prouse, 440 U.S. at 663, 99 S. Ct. at 1401). While requiring considerably less than proof of wrongdoing by a preponderance of the evidence, a reasonable suspicion requires something more than the officer's inchoate and unparticularized suspicion or hunch. United States v. Sokolow, 490 U.S. 1, 7, 109 S. Ct. 1581, 1585 (1989); Keith, 978 S.W.2d at 867.

Either probable cause or reasonable suspicion will justify a traffic stop under the United States and Tennessee constitutions without regard to the subjective motivations of the police officer involved. Wren, 517 U.S. at 813; 116 S. Ct. at 1774; United States v. Morales, 252 F.3d 1070, 1074 (9th Cir. 2001); United States v. Villa-Chaparro, 115 F.3d 797, 801 (10th Cir. 1997); Vineyard, 958 S.W.2d at 736; cf. generally City of Indianapolis v. Edmond, 531 U.S. 32, 45-46, 121 S. Ct. 447, 456-457 (2000). In short, the touchstone is reasonableness, whether under the state or federal constitution, State v. Jennette, 706 S.W.2d 614, 618 (Tenn. 1986), and "[r]easonableness, in turn, is measured in objective terms by examining the totality of the circumstances," Ohio v. Robinette, 519 U.S. 33, 39, 117 S. Ct. 417, 421 (1996).

The trial court in this case rejected any claim by the State that Officer Kohl possessed probable cause to believe that the appellant was driving carelessly in violation of Metropolitan Nashville Code § 12.68.170, noting that Kohl did not testify at the suppression hearing that "the purpose of the stop was based on a violation of § 12.68.170 of the Metropolitan Traffic Code . . . [and] the warning citation issued did not reference the cited section of the Metro Code, nor did it state 'careless driving.'" Instead, the trial court determined that Officer Kohl possessed a reasonable suspicion that the appellant was driving under the influence in violation of Tenn. Code Ann. § 55-10-401 (1998). In this regard, the court accredited Kohl's testimony at the suppression hearing, observing:

> The Court has reviewed the video tape recorded by Officer Kohl and finds that it does support her testimony. As she approaches the defendant's vehicle from two lanes over, it noticeably swerves to the right side of the lane. The Court finds it significant that the officer did not immediately stop the vehicle, but rather, began to monitor the

-14-

vehicle to determine whether the swerving would continue. In reviewing the video, the Court noted two other times, approximately 20 and 65 seconds from the officer's initial observation . . . , that the defendant's vehicle noticeably swerves from one side of the lane to the other. Also significant, and in further support of the officer's testimony, is the fact that there were several other vehicles traveling parallel to and in close proximity to the defendant's vehicle. This supports her testimony regarding the safety of the other motorists on the road. In addition, the Court would note that for a short period of time the defendant's vehicle is not on the videotape and could only have been observed by the officer. During this occasion and the initial observations made at the time when the defendant's vehicle was several car lengths ahead of the officer, only the officer, not the videotape, could accurately observe the defendant's driving pattern. While the Court would not necessarily classify the defendant's driving as "erratic," it was clearly characteristic of a driver who was either intoxicated or about to fall asleep at the wheel. The fact that there were other vehicles in close proximity to the defendant amplified the situation. As it turned out, the defendant admitted that he was very tired and had been driving for a long period of time, which confirmed the officer's suspicion.

In reviewing the trial court's determinations, we preliminarily note the following observation by the United States Supreme Court in Ornelas v. United States, 517 U.S. 690, 696-697, 116 S. Ct. 1657, 1661-1662 (1996)(alterations in original)(quoting Pullman-Standard v. Swint, 456 U.S. 273, 289 n.19, 102 S. Ct. 1781, 1791 n.19 (1982)):

The principal components of a determination of reasonable suspicion or probable cause will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause. The first part of the analysis involves only a determination of historical facts, but the second is a mixed question of law and fact: "[T]he historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the [relevant] statutory [or constitutional] standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated."

Thus, we review de novo the trial court's ultimate determination of whether the "historical facts" in this case amount to probable cause or reasonable suspicion. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)("Cases that involve mixed questions of law and fact are subject to de novo review."). But see State v. Long, 694 S.W.2d 337, 339 (Tenn. Crim. App. 1985)("The trial court's finding as to probable cause is to be given the weight of a jury verdict and is conclusive in this court unless the

-15-

evidence preponderates against that judgment."). The more difficult question is whether we should accord the trial court's findings of "historical facts" a presumption of correctness.

Relying upon Binette, 33 S.W.3d at 217, the appellant asserts that the recording of the traffic stop on videotape precluded "the normal deference given to trial courts on the basis of their unique position to observe the demeanor and conduct of witnesses," warranting instead an examination of the record de novo without a presumption of correctness. The State responds that, in contrast to Binette, id. at 216, the trial court in this case relied upon Officer Kohl's testimony in addition to the videotape in making its findings of fact. The State emphasizes the trial court's observation that, at times, "only the officer, not the videotape, could accurately observe the defendant's driving pattern." Accordingly, the State concludes that "the standard of review set forth in [Odom, 928 S.W.2d at 23,] is more properly applicable" to the trial court's findings of fact.

In Binette, 33 S.W.3d at 217, the supreme court explained that, when a trial court's findings of fact on a motion to suppress are based *solely* on evidence that does not involve issues of credibility, an appellate court "is in the same position as the trial court and is just as capable of reviewing the evidence." Accordingly, we agree with the State that, if the trial court had based its findings of fact on testimony by Kohl relating to the appellant's driving during those moments on the videotape recording when the appellant's vehicle is obscured from view due to the relative positions of the vehicle and Kohl's patrol car, the lighting conditions on the interstate, and other vehicles traveling on the interstate, this court would not be in the same position as the trial court in reviewing the evidence, and the Odom standard would apply. However, in its order denying the appellant's motion to suppress, the trial court ultimately cites its own observations of the videotape recording in support of its determination of reasonable suspicion. Indeed, the court could cite nothing else as Kohl did not testify at the suppression hearing or at trial that the appellant's vehicle engaged in any additional weaving during those moments on the videotape recording when it is obscured from view.

In any event, our de novo review of the videotape of the traffic stop in this case substantiates the trial court's findings that the appellant's vehicle drifted to the right side of its lane as Kohl began to drive past the vehicle, and the vehicle wove slowly from one side of its lane to another and back again on at least two additional occasions. Our review of the videotape also substantiates the trial court's observation of the presence of other vehicles in close proximity to the appellant's. Accordingly, we proceed to a determination of "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause." Ornelas, 517 U.S. at 696, 116 S. Ct. at 1661-1662.

The State effectively conceded in the trial court and now concedes on appeal that the appellant was driving in compliance with Tenn. Code Ann. § 55-8-123(1) (1998), which statutory provision states:

> Whenever any roadway has been divided into two (2) or more clearly
> marked lanes for traffic . . . [a] vehicle shall be driven as nearly as
> practicable entirely within a single lane and shall not be moved from

> such lane until the driver has first ascertained that such movement can be made with safety . . . .

The State did, however, attempt to argue at the suppression hearing that the appellant was driving his vehicle in violation of Metropolitan Nashville Code § 12.68.170, which section proscribes driving carelessly "so as . . . to endanger the life, limb or property of any person."  As noted by the trial court, Officer Kohl at no time claimed reliance upon or even knowledge of this metropolitan code section in stopping the appellant's vehicle.  Nevertheless, "an arrest is not rendered unlawful by the fact that an officer who has authority to make an arrest for a particular offense erroneously states he is making an arrest for some other offense, or even for a cause which is not in fact an offense, or states the offense inaccurately."  State v. Robinson, 622 S.W.2d 62, 68 (Tenn. Crim. App. 1980).[4]  Notably, the State does not include this argument in its brief on appeal.  In any event, as we conclude during our discussion below, the record simply does not reflect that, at the time of the traffic stop, the appellant was currently endangering "the life, limb or property of any person." Metropolitan Nashville Code § 12.68.170.

Our supreme court has acknowledged in the past that one of the first indications of drunk driving is "zigzagging down the road or driving in an unnatural fashion."  Ervin v. State, 268 S.W.2d 351, 353 (Tenn. 1954).  Yet, more recently, in Binette, 33 S.W.3d at 219, our supreme court refused to conclude that the weaving of an automobile within its own lane that is neither "pronounced" nor "exaggerated" affords an officer reasonable suspicion of the driver's intoxication. Similarly, this court has noted its reluctance

> to conclude that a person driving in a manner that an officer deems "improper," when the driving is not erratic or haphazard and does not create a dangerous situation, is subject to seizure while proceeding along a highway in a lawful manner.  Only the hypothetical "perfect" driver would not be subject to seizure if we were to hold that minor driving "errors," which neither violate our traffic code nor create a hazard, indicate that a person might be intoxicated."

---

[4] See also United States v. Lester, 647 F.2d 869, 873 (8th Cir. 1981)(holding that the "the validity of the arrest should be judged by whether the arresting officers actually had probable cause for the arrest, rather than by whether the officers gave the arrested person the right reason for the arrest"); United States v. Saunders, 476 F.2d 5, 7 (5th Cir. 1973)(holding that, "[w]hen an officer makes an arrest, which is properly supported by probable cause to arrest for a certain offense, neither his subjective reliance on an offense for which no probable cause exists nor his verbal announcement of the wrong offense vitiates the arrest"); State v. Munoz, 965 P.2d 349, 352 (N.M. Ct. App. 1998)(holding that "[t]he subjective belief of the officer does not in itself affect the validity of the [traffic] stop; it is the evidence known to the officer that counts, not the officer's view of the governing law"); WAYNE R. LAFAVE, 1 SEARCH AND SEIZURE, § 1.4(d), at 110-111 (3d ed. 1996)(observing that the exclusion of evidence solely due to an officer's mistaken statement of the grounds for an arrest is unjustified "because such situations are often attributable to complicated legal distinctions between offenses or an officer's failure to record all the bases or the strongest basis upon which the arrest was made"); cf. Florida v. Royer, 460 U.S. 491, 507, 103 S. Ct. 1319, 1329 (1983)(observing that "the fact that the officers did not believe there was probable cause and proceeded on a consensual or Terry-stop rationale would not foreclose the State from justifying [defendant's] custody by proving probable cause").

-17-

State v. Smith, 21 S.W.3d 251, 258 (Tenn. Crim. App. 1999); see also State v. Don Palmer Black, No. 03C01-9812-CR-00424, 1999 WL 1273510, at *5 (Tenn. Crim. App. at Knoxville, December 29, 1999).[5]

In Binette, 33 S.W.3d at 218 & 218 n. 2, the supreme court distinguished several cases in which the "police observed the defendant weave in a pronounced manner to the outside and inside boundaries of the lane." In particular, we note that the court distinguished the case of State v. Tompkins, 507 N.W.2d 736, 737 & 740 (Iowa Ct. App. 1993), in which the Iowa court found reasonable suspicion of a defendant's intoxication when the police officer followed the defendant's automobile for one mile and, during this distance, observed the defendant's car weave in its own lane of traffic between the center line and the right side boundary line four or five times. We have difficulty distinguishing Tompkins from the instant case. Nevertheless, two members of the panel of judges reviewing the instant case, including both the author of this opinion and Judge Smith, participated in State v. Guy Binette, No. 03C01-9802-CR-00075, 1999 WL 427606 (Tenn. Crim. App. at Knoxville, June 28, 1999), reversed by Binette, 33 S.W.3d at 220.[6] Recollecting the videotape of Binette's traffic stop, we must conclude that the appellant's vehicle in this case was weaving in neither a pronounced nor exaggerated manner.

That having been said, the supreme court in Binette, 33 S.W.3d at 219, cautioned that "[t]he number of times that a vehicle touches the center line or drifts within . . . a lane is not dispositive . . . . Rather, . . . a court must consider the totality of the circumstances in determining whether reasonable suspicion was present at the time a stop was initiated." See generally Cortez, 449 U.S. at 417-418, 101 S. Ct. at 695. The totality of circumstances "includes, but is not limited to, objective observations, information obtained from other police officers or agencies, information obtained from citizens, and the rational inferences and deductions that a trained police officer may draw from the facts and circumstances." State v. Harper, 31 S.W.3d 267, 271 (Tenn. Crim. App. 2000); see also State v. Simpson, 968 S.W.2d 776, 783 (Tenn. 1998).

---

[5]Cf. People v. Perez, 221 Cal. Rptr. 776, 778 (Cal. App. Dep't Super. Ct. 1985)("[P]ronounced weaving within a lane provides an officer with reasonable cause to stop a vehicle on suspicion of driving under the influence where such weaving continues for a substantial distance"); Roberts v. State, 732 So.2d 1127, 1128 (Fla. Dist. Ct. App. 1999)("[C]ontinuous weaving, even if only within [a motorist's own] lane, during the time that she was being followed presented an objective basis for suspecting that she was under the influence."); State v. Bailey, 624 P.2d 663, 664 (Or. Ct. App. 1981)("[T]he observation of a vehicle weaving within its own lane for a substantial distance gives rise to probable cause to believe that the driver is driving under the influence of intoxicants and justifies a stop for further investigation."); Commonwealth v. Baumgardner, 767 A.2d 1065, 1068 (Pa. Super. Ct. 2001)(holding that, in order to provide an officer with reasonable suspicion to stop a motorist on suspicion of driving under the influence, the weaving of an automobile within its own lane must be "'excessive,'" "'pronounced,'" or "'exaggerated'" as opposed to "'slight,'" "'minimum,'" or "'subtle'"); Neal v. Commonwealth, 498 S.E.2d 422, 425 (Va. Ct. App. 1998)("An isolated instance of mild weaving within a lane is not sufficiently erratic to justify an investigatory stop [of an automobile]. The test is one of reasonableness under 'the totality of circumstances.'").

[6]Judge Smith filed a dissenting opinion.

-18-

Viewing the totality of circumstances in this case, we note that, in contrast to the defendant in <u>Binette</u>, 33 S.W.3d at 219, the appellant did not successfully negotiate intersections, stop lights, and winding roads immediately prior to Kohl's traffic stop of his vehicle. Rather, he was traveling on an interstate highway and was confronted with only occasional and gradual curves. Moreover, in contrast to <u>Binette</u>, <u>id.</u> at 218, there was considerable traffic on the highway, heightening the *potential* danger to other motorists. Certainly, an officer is not required to postpone an investigative seizure until a motorist has a wreck. <u>Cf.</u> <u>Ervin</u>, 268 S.W.2d at 353. As noted by the United States Supreme Court in <u>Terry</u>, 392 U.S. at 20-21, 88 S. Ct. at 1879 (quoting <u>Camara v. Municipal Court</u>, 387 U.S. 523, 534-535 & 536-537, 87 S. Ct. 1727, 1735 (1967)), when assessing the reasonableness of an investigatory seizure, "it is necessary 'first to focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen,' for there is 'no ready test for determining reasonableness other than by balancing the need to . . . seize . . . against the invasion which the . . . seizure . . . entails.'" <u>See also</u> <u>Pulley</u>, 863 S.W.2d at 33 (observing that "the gravity of the perceived harm is a crucial element in assessing the reasonableness of an investigative <u>Terry</u> stop"). Nevertheless, even when viewed in the context of the totality of circumstances, the weaving of the appellant's vehicle in this case was simply insufficient to justify Kohl's stop of the appellant's vehicle based upon a reasonable suspicion of the appellant's intoxication.

Underscoring our conclusion, we also reject any contention that the officer's suspicion that the appellant was falling asleep afforded her an independent basis for the seizure. In <u>Mincey v. Arizona</u>, 437 U.S. 385, 392, 98 S. Ct. 2408, 2413 (1978)(quoting <u>Wayne v. United States</u>, 318 F.2d 205, 212 (D.C. Cir. 1963)), the Supreme Court observed, "'The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.'" Correspondingly, the Court has noted:

> Because of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office. Some such contacts will occur because the officer may believe the operator has violated a criminal statute, but many more will not be of that nature. Local police officers . . . frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

<u>Cady v. Dombrowki</u>, 413 U.S. 433, 441, 93 S. Ct. 2523, 2528 (1973). Whether relying upon a theory of exigency, a "community caretaking functions" doctrine, or both, several courts have acknowledged that probable cause to believe or reasonable suspicion of *criminal activity* may not be a necessary prerequisite to an officer's investigative stop of an automobile or other seizure. <u>See, e.g.</u>, <u>United States v. Gregory</u>, 79 F.3d 973, 978 (10th Cir. 1996); <u>Russoli v. Salisbury Township</u>, 126 F. Supp.2d 821, 846-848 (E.D. Penn. 2000); <u>State v. Field</u>, 847 P.2d 1280, 1283-1284 (Kan. 1993); <u>Rowe v. State</u>, 769 A.2d 879, 890-891 (Md. Ct. App. 2001); <u>State v. Pinkham</u>, 565 A.2d 318, 319

(Me. 1989); <u>Barrett v. Commonwealth</u>, 462 S.E.2d 109, 111-112 (Va. 1995). However, as noted previously, the appellant's driving in this case did not constitute an imminent threat of injury or death to himself or others, and Kohl herself conceded that her stop of the appellant's automobile was not "divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." <u>Dombrowki</u>, 413 U.S. at 441, 93 S. Ct. at 2528.[7]

### iii.

Assuming in anticipation of further appellate proceedings that the traffic stop of the appellant's vehicle was lawful at its inception, an investigative detention may violate the Fourth Amendment to the United States Constitution and Article I, Section 7 of the Tennessee Constitution "by virtue of its intolerable intensity and scope." <u>Terry</u>, 392 U.S. at 18-20, 88 S. Ct. at 1878-1879; <u>see also</u> <u>Simpson</u>, 968 S.W.2d at 783. In other words, the officer's interference with a person's constitutionally protected liberty interests must be *both* justified at its inception and reasonably related in scope to those circumstances justifying the interference. <u>Terry</u>, 392 U.S. at 19-20, 88 S. Ct. at 1879. With respect to the lawful scope of an investigative detention, a plurality of the United States Supreme Court has elaborated that

> an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.

<u>Florida v. Royer</u>, 460 U.S. 491, 500, 103 S. Ct. 1319, 1325-1326 (1983); <u>see also</u> <u>Sharpe</u>, 470 U.S. at 686, 105 S. Ct. at 1575 (observing that, when assessing whether a detention is too long to be justified as an investigative stop, the proper inquiry is whether the police "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant"); <u>Simpson</u>, 968 S.W.2d at 783 (citing <u>Sharpe</u>, 470 U.S. at 686, 105 S. Ct. at 1575).[8] The reasonableness of the scope of a traffic stop, like the reasonableness

---

[7]In <u>State v. Jennifer Gale McClure</u>, No. W2000-01822-CCA-R3-CD, 2001 WL 720649, at *10 n. 2 (Tenn. Crim. App. at Jackson, June 27, 2001), we acknowledged that, outside the context of an officer's probable cause to believe or reasonable suspicion of criminal activity, whether an intrusion upon an individual's privacy or personal security is completely pretextual may indeed be relevant. <u>Cf. also Edmond</u>, 531 U.S. at 45-46, 121 S. Ct. at 456-457. That said, we emphasize that we are referring here to Kohl's belief that the appellant was intoxicated and not to the appellant's contention that Kohl's traffic stop of his automobile was otherwise pretextual.

[8]Some courts have distinguished for analytical purposes between the "scope" of an investigative detention and the "duration" of an investigative detention, the former term evidently referring exclusively to the investigative methods employed by police during the detention. <u>See, e.g.</u>, <u>United States v. Purcell</u>, 236 F.3d 1274, 1277-1280 (11th Cir. 2001). While purely a matter of semantics, we find it more useful to consider both the duration of the traffic stop and the investigative methods employed by police during the stop to be interrelated facets of the detention's scope. Concededly, the Supreme Court has indicated that, "if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop," regardless of the efficiency of investigative methods employed by the police. <u>Sharpe</u>, 470 U.S. at 685, 105 S. Ct. at 1575. Conversely, some courts have suggested that certain police investigative methods may violate constitutional proscriptions regardless of their impact upon the duration of the traffic stop. <u>Cf. United States v. Holt</u>, 264 F.3d 1215, 1228-1229 (10th Cir. 2001)(en banc), and <u>United States v. Shabazz</u>, 993 F.2d 431, 436 (5th Cir.
(continued...)

-20-

of its justification, will be measured in objective terms without regard to the subjective intentions of the officer. Robinette, 519 U.S. at 38, 117 S. Ct. at 420-421.

In this case, the appellant contends that Kohl's inquiries concerning the appellant's destination, the ownership of his vehicle, his occupation, and his record of traffic violations and arrests were unrelated to the justification for or purpose of the traffic stop, i.e., ascertaining whether the appellant was intoxicated or falling asleep at the wheel. Similarly, he contends that Kohl's subsequent radio call to Officer Hunter requesting the presence of a drug-detection dog at the scene of the traffic stop and her preparation of a Spanish "Consent to Search" form exceeded the lawful scope of the traffic stop. Finally, the appellant contends that Kohl's request to search his vehicle additionally and unreasonably expanded his detention beyond its lawful scope.

The State responds that Kohl's initial questioning of the appellant was consistent with the purpose of the traffic stop, and the appellant's responses contributed to the officer's reasonable suspicion that the appellant was transporting illegal drugs. Kohl's reasonable suspicion, in turn, justified any additional detention of the appellant occasioned by the officer's radio call to Hunter and her preparation of a Spanish "Consent to Search" form. The State does not address on appeal the appellant's complaint concerning Kohl's request to search the appellant's vehicle; however, in the trial court, the State asserted that the officer's request occurred following the conclusion of the traffic stop and during an ensuing consensual encounter.

> The trial court concluded that
> the questions posed by Officer Kohl were not beyond the scope of the traffic stop. As already indicated by the Court, Officer Kohl had reasonable suspicion to believe that the defendant was intoxicated or was about to fall asleep at the wheel. She testified that the defendant explained that the reason he was tired was because he had been driving since leaving Los Angeles the previous day (this is implausible in and of itself) and had only slept briefly at a few rest stops. The conversation logically continued with a discussion concerning the defendant's destination and ownership of the vehicle. Officer Kohl's testimony regarding the questions she asked also indicated that she was trying to determine whether the defendant was intoxicated or just tired.
>
> In terms of the additional time it took Officer Kohl to fill out a consent to search form and request that a drug detection dog be sent to the location, the Court finds that these actions by the officer were not unreasonable under the state and federal constitutions and were

---

[8](...continued)
1993). Generally, however, the reasonableness of a traffic stop's duration will be judged by reference to the police investigative methods occasioning that duration, and the reasonableness of police investigative methods will be judged, at least in part, by reference to the time required for their completion.

supported by reasonable suspicion that the defendant was engaged in criminal activity at the time she was filling out the form and making the request. The defendant's evasiveness in answering the officer's questions regarding his destination and the ownership of the vehicle, along with the fact that the vehicle had California license plates, created rational inferences and deductions that the defendant's vehicle was possibly stolen, or that he was possibly engaged in transporting contraband. . . . While the evasiveness of the defendant's responses did not rise to the level of giving the officer probable cause to arrest or search the defendant's vehicle at that point during the stop, it did give the officer reasonable suspicion to detain the defendant long enough to fill out the consent form, request the drug detection dog and to ask the defendant for his consent to search the vehicle.

In regard to the additional questioning concerning whether there was contraband in the vehicle and whether the defendant would consent to having the vehicle searched, the Court finds that these actions were also based upon reasonable suspicion.

. . . .

As to the detention of the defendant in the case at bar, the Court credits Officer Kohl's testimony and finds that any extended detention of the defendant after the initial stop was based upon reasonable suspicion. Even assuming Officer Kohl did not have reasonable suspicion, the Court would find that the "extended" detention in this case was minuscule and not unreasonable under either the state or federal constitutions . . . .

We first address the legality of Kohl's inquiries concerning the appellant's destination, the ownership of his vehicle, his occupation, and his record of traffic violations and arrests. Exploring the appropriate scope of an investigative detention, our supreme court has indicated that the police may employ investigative methods unrelated to the purpose of the detention so long as the investigative methods do not prolong the detention and do not otherwise implicate federal or state constitutional provisions. See England, 19 S.W.3d at 767-768. That having been said, we note that courts have disagreed about whether a police officer's questioning of a motorist on a subject unrelated to the purpose of a traffic stop violates the Fourth Amendment even when the questioning does not prolong the initial, valid seizure. Cf., e.g., United States v. Holt, 264 F.3d 1215, 1228-1229 (10th Cir. 2001), and United States v. Shabazz, 993 F.2d 431, 436 (5th Cir. 1993). In any event, Officer Kohl's questioning of the appellant in this case in fact prolonged the traffic stop. Therefore, we must determine whether the questioning was related to Kohl's initial purpose of ascertaining whether the appellant was intoxicated or falling asleep.

Preliminarily, courts have held that requests for driver's licenses and vehicle registration documents, inquiries concerning travel plans and vehicle ownership, computer checks, and the issuance of citations are investigative methods or activities consistent with the lawful scope of any traffic stop. United States v. West, 219 F.3d 1171, 1176 (10th Cir. 2000); United States v. Hill, 195 F.3d 258, 268 (6th Cir. 1999); United States v. Lyton, 161 F.3d 1168, 1170 (8th Cir. 1998). But see United States v. Garcia, 205 F.3d 1182, 1187 (9th Cir. 2000)(holding that officer's inquiries concerning driver's travel plans did not exceed the scope of traffic stop when "it was standard procedure to delay drivers for a short period of time to wait for an arrest report," the conversation did not cause any additional delay, and the conversation did not alter the subsequent chain of events). However, they have generally done so in the context of traffic stops based upon probable cause to believe that the motorist committed a traffic violation. In the context of a traffic stop based upon reasonable suspicion, at least one court has ruled that the stop must end as soon as the suspicion is dispelled and may not be prolonged even to perform the limited functions enumerated above. United States v. McSwain, 29 F.3d 558, 561 (10th Cir. 1994). Nevertheless, we conclude that requesting a motorist's identification and engaging him in a brief conversation by asking routine questions concerning his destination and purpose and the ownership of his vehicle may be reasonably related to ascertaining the cause of erratic or irregular driving and determining whether the motorist poses a danger to others on the road. See, e.g., United States v. Barahona, 990 F.2d 412, 416 (8th Cir. 1993). The difficulty in the instant case lies in Kohl's concession at the suppression hearing that, after discussing with the appellant "his length of travel" and observing him retrieve his driver's license, she was satisfied that he was not intoxicated. Moreover, at that point, she had obtained an explanation for the appellant's weaving. While the appellant's admitted fatigue justified Kohl's further inquiry regarding his precise destination in Georgia, Kohl's subsequent inquiries concerning the ownership of the vehicle in which the appellant was driving, the appellant's occupation, and the appellant's record of traffic violations and arrests were inconsistent with the original purpose of the traffic stop.

Of course, "[a]fter [Kohl] satisfied [herself] that [the appellant] was not drunk or otherwise impaired, [she] [was] justified in continuing to detain [the appellant] if, by then, [she] had reasonable and articulable suspicion that [the appellant] was engaged in other criminal activity." United States v. Erwin, 155 F.3d 818, 822 (6th Cir. 1998); see also, e.g., United States v. Murillo, 255 F.3d 1169, 1174 (9th Cir. 2001). As previously indicated, a determination of reasonable suspicion depends upon the totality of circumstances "as understood by those versed in the field of law enforcement." Cortez, 449 U.S. at 418, 101 S. Ct. at 695. Again, the trial court concluded that the appellant's "evasiveness in answering the officer's questions regarding his destination and the ownership of the vehicle, along with the fact that the vehicle had California license plates," afforded Kohl a reasonable suspicion that the appellant's vehicle was stolen or the appellant was transporting contraband. The State additionally notes the appellant's virtually nonstop journey from California, reflected by the litter in the appellant's vehicle. Finally, the officer noted the presence of air freshener in the appellant's vehicle.

A motorist's inability to produce proof of ownership of his vehicle or authorization to operate the vehicle may justify a reasonable suspicion of criminal activity, United States v. Hunnicutt, 135 F.3d 1345, 1349 (10th Cir. 1998), including the transportation of contraband, United

States v. Arango, 912 F.2d 441, 447 (10th Cir. 1990). Moreover, inconsistencies in information given to an officer during a traffic stop, such as the appellant's statements concerning the identity of the owner of the vehicle that he was driving, may give rise to reasonable suspicion of criminal activity. United States v. Smith, 263 F.3d 571, 592 (6th Cir. 2001). However, we reiterate that Kohl's questions concerning the ownership of the vehicle exceeded the lawful scope of the traffic stop.

Turning to the remaining grounds of reasonable suspicion, a motorist's lack of knowledge concerning his precise destination and a motorist's out-of-state license plate will not, without more, support an officer's reasonable suspicion of criminal activity. United States v. Ramos, 42 F.3d 1160, 1163 (8th Cir. 1994). As to Kohl's observation of a can of air freshener in the appellant's vehicle, we note that she only detected a slight odor of the air freshener emanating from the vehicle. Thus, notwithstanding her knowledge of the frequent use of air freshener by drug couriers to mask the odor of illegal drugs, her observation minimally strengthened her suspicion of criminal activity. Cf., e.g., West, 219 F.3d at 1178; United States v. Patterson, 65 F.3d 68, 71 (7th Cir. 1995); United States v. Rivera, 595 F.2d 1095, 1099 (5th Cir. 1979). Finally, unusual travel plans may support an officer's reasonable suspicion of criminal activity. Sokolow, 490 U.S. at 9, 109 S. Ct. at 1586-1587. In this case, the appellant's travel plans included driving virtually nonstop from California to Georgia in two days. Nevertheless, while acknowledging Officer Kohl's experience and specialized training, we must conclude that the totality of circumstances did not support a reasonable suspicion of criminal activity sufficient to warrant expanding the scope of the traffic stop absent the appellant's responses to Kohl's questioning concerning the ownership of the vehicle. Cf. Murillo, 255 F.3d at 1174 (evidence of a long road trip in a short time frame in a rental car contributed along with other factors to officer's reasonable suspicion of drug-related criminal activity), and United States v. Wood, 106 F.3d 942, 947 (10th Cir. 1997)(the presence of fast food wrappers in a vehicle will not otherwise support an officer's reasonable suspicion of criminal activity). In so concluding, we note the United States Supreme Court's recent observation that several factors taken together may form a particularized and objective basis for a Fourth Amendment intrusion even when each individual factor alone is susceptible to innocent explanation. United States v. Arvizu, __ U.S. __, __, 122 S. Ct. 744, __ (2002). The factors in this case, however, formed no more than an inchoate and unparticularized hunch of criminal activity.

Accordingly, other than advising the appellant to rest prior to continuing his journey, Kohl was required to terminate the traffic stop following her inquiries concerning the appellant's destination. Instead, the detention continued until Kohl's return to the appellant of his driver's license and vehicle registration document and her issuance of a warning citation, approximately thirteen minutes following the traffic stop's inception. "When a police officer issues a traffic citation or warning and returns a driver's license and registration, a traffic stop ceases to be a seizure for purposes of the Fourth Amendment to the United States Constitution and Article I, Section 7 of the Tennessee Constitution and becomes a consensual encounter unless a driver has 'objectively reasonable' cause to believe that he or she is not free to leave." See State v. McCrary, 45 S.W.3d 36, 42 (Tenn. Crim. App. 2000), perm. to appeal denied, (Tenn. 2001), and cases cited therein. The determination of the point at which the traffic stop ceases to be a seizure is ultimately a question of law. Id.; see also State v. Daniel, 12 S.W.3d 420, 423-424 (Tenn. 2000)("[T]he trial court's

conclusion that a seizure did not occur is a conclusion of law derived from an application of the law to the undisputed facts of this case.").

Our conclusion that the traffic stop terminated upon Kohl's return to the appellant of his driver's license and vehicle registration document and her issuance of a warning citation entails our resolution of the appellant's further complaint that Kohl's request for his consent to a search of his vehicle likewise exceeded the lawful scope of the traffic stop.[9] In particular, the record reflects that Kohl's request for the appellant's consent occurred following her return to the appellant of his driver's license and vehicle registration document and her issuance of a warning citation. Moreover, Kohl informed the appellant that he was free to leave prior to requesting his consent, cf, e.g., Immigration and Naturalization Service v. Delgado, 466 U.S. 210, 216-221, 104 S. Ct. 1758, 1762-1765 (1984), and neither an officer's request for a motorist's consent to a search of his vehicle nor an officer's inquiry concerning the presence of weapons or illegal drugs in the vehicle, without more, constitutes objectively reasonable cause to believe that the motorist is not free to leave. McCrary, 45 S.W.3d at 43, and cases cited therein. Finally, we do not believe that the mere presence of a second patrol car transformed the encounter into a seizure, particularly as the appellant was unaware that Kohl had requested the presence of the additional officer, and Hunter and Lou remained in their patrol car until the appellant consented to a search of his vehicle. Accordingly, Kohl's request for the appellant's consent to a search of his vehicle did not implicate the Fourth Amendment to the United States Constitution or Article I, Section 7 of the Tennessee Constitution.

**iv.**

Focusing next, for reasons made apparent later in this opinion, upon the consent itself and the consequent search of the appellant's vehicle, it is well settled that a search conducted pursuant to a voluntary consent is yet another exception to the requirement that searches and seizures be conducted pursuant to a warrant. State v. Bartram, 925 S.W.2d 227, 230 (Tenn. 1996)(citing Schneckloth v. Bustamonte, 412 U.S. 218, 93 S. Ct. 2041 (1973)). In contrast to the determination of when a seizure has occurred, the determination of whether a consent to a search was voluntarily given is a question of fact to be determined from the totality of circumstances. Schneckloth, 412 U.S. at 227, 248-249, 93 S. Ct. at 2047-2048, 2059; Ashworth, 3 S.W.3d at 29. Significantly, the appellant does not dispute the trial court's finding that the appellant's consent to the search of his vehicle was, in fact, "'unequivocal, specific, intelligently given, and uncontaminated by duress or coercion,'" Simpson, 968 S.W.2d at 784 (citing State v. Brown, 836 S.W.2d 530, 547 (Tenn. 1992)); Ashworth, 3 S.W.3d at 29; see also Schneckloth, 412 U.S. at 248-249, 93 S. Ct. at 2059, and the record does not preponderate otherwise. Rather, as noted earlier, the appellant asserts that the officers' search in this case exceeded the scope of his consent.

---

[9] In this regard, we acknowledge that the State failed to address in its brief the constitutionality of Kohl's request for the appellant's consent, but "this Court should be free to examine the validity of a search [or other Fourth Amendment intrusion] using any appropriate legal analysis where the record in the case permits us to do so." State v. James A. Hearn, No. 01C01-9511-CR-00377, 1997 WL 537089, at *2 (Tenn. Crim. App. at Nashville, September 2, 1997)(Smith, J., concurring); see also State v. Jose Roberto Ortiz, No. M1998-00483-CCA-R3-CD, 1999 WL 1295988, at *7 (Tenn. Crim. App. at Nashville, December 30, 1999).

Initially, regardless of the precise scope of the appellant's consent, the drug-detection dog Lou signaled to the officers the presence of illegal drugs in the appellant's vehicle. "A positive indication by a properly-trained dog is sufficient to establish probable cause for the presence of a controlled substance." United States v. Navarro-Camacho, 186 F.3d 701, 706 (6th Cir. 1999); see also England, 19 S.W.3d at 768. Moreover, in Carroll, 267 U.S. at 149, 45 S. Ct. at 283-284, the United States Supreme Court held that an officer's probable cause to believe that an automobile contains contraband will authorize the warrantless search of the automobile. See also Maryland v. Dyson, 527 U.S. 465, 466-467, 119 S. Ct. 2013, 2014 (1999). Indeed, in Carroll, 267 U.S. at 132, 45 S. Ct. at 280, the Court concluded that probable cause supported the officers' search of the defendant's vehicle despite the officers' removal of the upholstering on the seats. In other words, application of the automobile exception to the warrant requirement authorizes even the destructive dismantlement of portions of an automobile in which contraband may be secreted. See, e.g., California v. Acevedo, 500 U.S. 565, 571, 111 S. Ct. 1982, 1987 (1991)(noting the Court's application of the Carroll doctrine to "searches of integral parts of the automobile itself"); see also, e.g., Patterson, 65 F.3d at 71 (noting that probable cause would authorize dismantling the "interior cover" of a truck's tailgate); United States v. Strickland, 902 F.2d 937, 942 (11th Cir. 1990)(noting that a search based upon probable cause may include some injury to the vehicle or items within the vehicle if the damage is reasonably necessary to gain access to a specific location where contraband is likely to be found).

That having been said, a finding of probable cause on the basis of a drug-detection dog's indication of the presence of illegal drugs should turn on the reliability of the dog, and the trial court should ensure that the dog is reliable by an appropriate finding of fact. England, 19 S.W.3d at 768. Factors relevant to a dog's reliability include the dog's training, the dog's "track record," with emphasis on the amount of false negatives and false positives the dog has furnished, and the officer's training and experience with this particular dog. Id. The trial court in this case did not directly address the issue of Lou's reliability as it did not have the benefit of our supreme court's decision in England. The court did, nevertheless, note Hunter's testimony concerning both his own certification as a trainer of drug-detection dogs and Lou's training in drug detection. We note, however, that, although Hunter testified that drug-detection dogs are generally trained by their handlers, he did not explicitly recount his own training and experience with Lou, nor did he testify concerning Lou's "track record." Cf. State v. Selina G. Harrelson, No. W1999-00521-CCA-R3-CD, 2000 WL 1051854, at *6 (Tenn. Crim. App. at Jackson, July 28, 2000), perm. to appeal denied, (Tenn. 2001). The Sixth Circuit Court of Appeals has observed:

> When the evidence presented, whether testimony from the dog's trainer or records of the dog's training, establishes that the dog is generally certified as a drug detection dog, any other evidence, including the testimony of other experts, that may detract from the reliability of the dog's performance properly goes to the "credibility" of the dog. Lack of additional evidence, such as documentation of the exact course of training, similarly would affect the dog's reliability.

United States v. Diaz, 25 F.3d 392, 394 (6th Cir. 1994). In any event, we need not evaluate the evidence of Lou's reliability as we conclude that, in fact, the officers did not unlawfully exceed the scope of the appellant's consent to search.

The trial court in this case concluded that the "search conducted by police did not exceed the consent granted by the defendant." The scope of a party's consent is measured by a standard of "'objective' reasonableness -- what would the typical reasonable person have understood by the exchange between the officer and the suspect." Florida v. Jimeno, 500 U.S. 248, 251, 111 S. Ct. 1801, 1803-1804 (1991). "Objective reasonableness is a question of law that is reviewed de novo." United States v. Rich, 992 F.2d 502, 505 (5th Cir. 1993). But cf. United States v. Martel-Martines, 988 F.2d 855, 858 (8th Cir. 1993).

The understanding of a "typical reasonable person" will generally depend upon the object of the search. Jimeno, 500 U.S. at 251, 111 S. Ct. at 1804. Thus, in Jimeno, the United States Supreme Court concluded that, when an officer informs a motorist that he is searching for narcotics, it is objectively reasonable for the officer to conclude that a general consent to search the motorist's vehicle includes consent to search containers within the vehicle that might contain drugs. Id. More importantly, "'courts have given broad scope to a consent to a general search of a vehicle for narcotics, interpreting the consent to include non-destructive dismantlement of parts of the vehicle, particularly when the defendant was present at the time and voiced no objection.'" State v. Garcia, 986 P.2d 491, 493-494 (N.M. App. Ct. 1999); see also United States v. Zapata, 180 F.3d 1237, 1243 (11th Cir. 1999)(holding that a police officer did not exceed the scope of a general consent when he removed an interior door panel of an automobile with his fingers, dislocating two plastic clips; "a search does not exceed the scope of consent merely because an officer forces open a secured compartment that reasonably may contain the objects of the search"); United States v. Flores, 63 F.3d 1342, 1362 (5th Cir. 1995)(holding that police did not exceed scope of general consent by removing two screws and two vent covers from the interior panels of an automobile); United States v. Torres, 32 F.3d 225, 231-232 (7th Cir. 1994)(indicating that general consent encompassed the removal of screws fastening a wooden compartment of a trailer); cf. United States v. Alverez, 235 F.3d 1086, 1088-1089 (8th Cir. 2000)(general consent to search a vehicle likely did not encompass the cutting of the spare tire), and Martel-Martines, 988 F.2d at 858 (holding that the defendant's failure to object rendered it objectively reasonable for officers to conclude that the his general consent to a search of his truck included consent to punch a small hole in a concealed compartment).

The record in this case reflects that the appellant was aware of the object of the officer's search, namely illegal drugs. Moreover, the "Consent to Search" form signed by the appellant provided, "I . . . give my consent to Agents of the 20[th] Judicial District Drug Task Force, to conduct a complete search of my entire vehicle and contents within it." The search of the officers pursuant to this consent extended to the removal of the screws from the molding covering one of the vehicle's rocker panels and the molding itself, actions unaccompanied by any objection from the appellant and constituting "non-destructive dismantlement" of a portion of the vehicle. Indeed, the appellant had previously stood by silently while the officers engaged in other "non-destructive dismantlement" of his vehicle. Accordingly, we cannot conclude that the removal of the screws and the molding was outside the scope of the appellant's general consent. Having removed the screws

and molding, the officers could insert a probe into the pre-existing screw holes, thereby discovering the presence of a foreign object inside the normally hollow rocker panel and, particularly in combination with the drug-detection dog's positive indication of the presence of illegal drugs, establishing the probable cause necessary to extend the search beyond the scope of the appellant's consent.

**v.**

Finally, we address an issue largely neglected by both parties in this appeal, namely whether the exclusionary rule requires the suppression of the methamphetamine seized by police in the instant case. State v. James A. Hearn, No. 01C01-9511-CR-00377, 1997 WL 537089, at *2 (Tenn. Crim. App. at Nashville, September 2, 1997)(Smith, J., concurring); see also State v. Jose Roberto Ortiz, No. M1998-00483-CCA-R3-CD, 1999 WL 1295988, at *7 (Tenn. Crim. App. at Nashville, December 30, 1999), perm. to appeal denied, (Tenn. 2000). Although we have concluded that Kohl's traffic stop of the appellant violated the Fourth Amendment to the United States Constitution and Article I, Section 7 of the Tennessee Constitution both at its inception and in its scope, the United States Supreme Court has observed, "The question whether the exclusionary rule's remedy is appropriate in a particular context has long been regarded as an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by the police conduct." Illinois v. Gates, 462 U.S. 213, 223, 103 S. Ct. 2317, 2324 (1983); see also, e.g., Daniel, 12 S.W.3d at 428.

In Wong Sun v. United States, 371 U.S. 471, 484, 83 S. Ct. 407, 416 (1963), the Supreme Court broadly observed that the exclusionary rule operates to bar the admissibility of evidence obtained both directly and derivatively from an unlawful invasion of an individual's privacy or personal security. However, the Court declined to hold that "all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police." Id. at 487-488, 417. Instead, the court held that, in determining whether physical or verbal evidence is the fruit of a prior illegality, the "apt question . . . is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" Id. at 488, 417. Thus, a consent to a search that is preceded by an unlawful seizure may nevertheless validate the search if the consent is both (1) voluntary, Simpson, 968 S.W.2d at 784; Schneckloth, 412 U.S. at 248-249, 93 S. Ct. at 2059; and (2) "sufficiently an act of free will to purge the primary taint of the unlawful invasion," Wong Sun, 371 U.S. at 486, 83 S. Ct. at 416-417; cf. Brown v. Illinois, 422 U.S. 590, 602, 95 S. Ct. 2254, 2261 (1975); United States v. Peters, 10 F.3d 1517, 1534 (10th Cir. 1993); see also United States v. Chavez-Villareal, 3 F.3d 124, 127-128 (5th Cir. 1993); United States v. Richardson, 949 F.2d 851, 858 (6th Cir. 1991). "The first prong focuses on coercion, the second on the causal connection with the constitutional violation." Chavez-Villareal, 3 F.3d at 127.

As previously noted, the appellant consented to a search of his vehicle following the conclusion of the unlawful traffic stop in this case. Once again, the trial court found and it is undisputed that the appellant's consent was voluntary. Of course, due to its determination that Kohl's traffic stop of the appellant comported with the Fourth Amendment of the United States

Constitution and Article I, Section 7 of the Tennessee Constitution, the trial court did not address the issue of attenuation. Nevertheless, the issue of attenuation is one that this court reviews de novo, State v. Ford, 30 S.W.3d 378, 380 (Tenn. Crim. App. 2000), and the record before this court is adequate for purposes of our review.

To determine whether the causal connection between an illegal seizure and a consent to search has been broken, a court should consider the following factors set forth by the United States Supreme Court in Brown, 422 U.S. at 603-604, 95 S. Ct. at 2261-2262: (1) the temporal proximity of the illegal seizure and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. The State carries the burden of establishing sufficient attenuation. Id. at 604, 2262.

We acknowledge that the appellant consented to a search of his vehicle within minutes of the conclusion of the traffic stop in this case. Moreover, any reasonable suspicion arising during an unlawful traffic stop will not attenuate the connection between the seizure and a subsequent consent to a search. United States v. Ward, 961 F.2d 1526, 1534-1535 (10th Cir. 1992), overruled on other grounds by United States v. Little, 18 F.3d 1499, 1506 (10th Cir. 1994); cf. United States v. Sprinkle, 106 F.3d 613, 619 (4th Cir. 1997); State v. Robert Lee Mallard, No. M2000-00351-R3-CD, 2001 WL 178461, at **4-5 (Tenn. Crim. App. at Nashville, February 23, 2001). Conversely, as already noted, Kohl did not require reasonable suspicion of criminal activity in order to request the appellant's consent to search his vehicle, and Kohl did not use knowledge acquired during the unlawful traffic stop to elicit a consent from the appellant. Cf. United States v. Hearn, 496 F.2d 236, 241-244 (6th Cir. 1974). In fact, Kohl's preparation of a Spanish "Consent to Search" form during the appellant's detention was intended to ensure that any subsequent consent was an independent act of free will. Correspondingly, although Kohl radioed Officer Hunter during the appellant's detention, she did not inform the appellant that she had requested Hunter's and Lou's presence, nor did she indicate any intention to seek their assistance until and unless the appellant consented to a search of his vehicle. In other words, she did not obtain the appellant's consent by exploiting the fruit of the unlawful detention. Indeed, examples of circumstances sufficient to create a discontinuity between an illegal traffic stop and a consent to search include the officer's communication to the driver that he is free to leave prior to requesting consent to search and her advice to the driver of his right to refuse consent. United States v. Ramstad, 120 F. Supp.2d 973, 980 (D. Kan. 2000); see also United States v. Fernandez, 18 F.3d 874, 882 (10th Cir. 1994); United States v. Ramos, 42 F.3d 1160, 1163-1164 (8th Cir. 1994); Bretti v. Wainwright, 439 F.2d 1042, 1045-1046 (5th Cir. 1971). The record in this case reflects both of the above circumstances. In particular, we note that, notwithstanding the language barrier between Kohl and the appellant, the appellant emphasized at trial that he understood that he was free to leave and that he was free to refuse consent to the search. Finally, contrary to the appellant's assertions in his brief, we do not believe that the official misconduct in this case, i.e., the traffic stop, was either flagrant or characterized by "a quality of purposefulness." Brown, 422 U.S. at 605, 95 S. Ct. at 2262.

Whether Kohl's misconduct was flagrant or purposeful is particularly important to our attenuation analysis in light of the deterrent purposes of the exclusionary rule. As one noted authority has observed, "the underlying purpose of the 'attenuated connection' test is to mark 'the point of diminishing returns of the deterrence principle.'" WAYNE R. LAFAVE, 5 SEARCH AND SEIZURE, § 11.4(a), at 235 (3d ed. 1996). That the impropriety of the seizure in this case was not obvious and that the point of diminishing returns was reached is apparent from the trial court's agreement with Kohl that the appellant's driving "was clearly characteristic of a driver who was either intoxicated or about to fall asleep at the wheel," and is illustrated by the legitimate disagreements between judges and courts in Binette, No. 03C01-9802-CR-00075, 1999 WL 427606, at **1-2, and Binette, 33 S.W.3d at 220-222, concerning the degree of weaving within a lane that will support an officer's reasonable suspicion of the driver's intoxication. Cf. Chavez-Villareal, 3 F.3d at 128 ("[T]he required indicia of individualized suspicion were so utterly lacking herein that only suppression will serve the deterrence function of the exclusionary rule."). Similarly, while the scope of the traffic stop exceeded its justification, the lack of reasonable suspicion justifying the officer's expansion of that scope was not indisputable, and, the thirteen-minute detention did not otherwise amount to an instance of "flagrant" misconduct. Also, we do not believe that Kohl's status as a member of the Highway Interdiction Unit alone preponderates against the trial court's manifest accreditation of her testimony concerning the purpose of the traffic stop. In this regard, we emphasize that there is no evidence before this court of the pattern of abuse of authority that so concerned Circuit Judge Clay in his concurring opinion in United States v. Freeman, 209 F.3d 464, 467-472 (6th Cir. 2000).

In sum, we conclude that the appellant's consent to the search of his vehicle and the officers' consequent discovery of 40.1 pounds of methamphetamine were not the fruit of Kohl's unlawful traffic stop of the appellant. Therefore, we cannot say that the trial court erred in denying the appellant's motion to suppress with respect to the methamphetamine seized from the appellant's vehicle. We note, however, that the trial court should have suppressed at trial Kohl's testimony concerning her observations during the unlawful detention and until her return to the appellant of his driver's license and vehicle registration document and her issuance of a warning citation. Because we are reversing the appellant's conviction on other grounds and remanding this case for a new trial, the court below should limit Kohl's testimony accordingly.

## B. Testimony by Officer Daniel Rosales

The appellant next challenges the trial court's admission at trial of the testimony of Officer Rosales that criminal organizations dealing in illegal drugs select only trusted individuals to transport their goods and that such organizations calculate the courier's fee according to the amount of illegal drugs transported. The appellant grounds his complaint upon the following two arguments: (1) the State failed to timely notify him of its intention to call Rosales as a witness, thereby violating Tenn. R. Crim. P. 12; and (2) Rosales' testimony was inadmissible pursuant to Tenn. R. Evid. 702 and 403.

The State responds that "there [was] no prolonged delay between the State's decision to call [Rosales as a witness] and the defendant's receipt of notification." Moreover, the State argues that the exclusion of Rosales' testimony was not the appropriate remedy for any delay as the remedy of a continuance was available to the appellant. Finally, the State asserts that "Officer Rosales' testimony substantially assisted the trier of fact in this case in that it established that the car contained nearly two million dollars of methamphetamine, that drug couriers were paid by the amount being transported, and that drug dealers did not cavalierly relinquish control of such expensive merchandise."

**i.**

The record reflects that the appellant filed a motion for discovery on October 19, 1999. Among other items, he requested "[t]he correct names and current addresses of any witness the State intends to use in its case in chief and particularly those whose names are not endorsed on the Indictment." The appellant cited Tenn. Code Ann. § 40-17-106 (1997) in support of his request. The prosecutor filed a response on October 28, 1999, but did not name any additional witnesses. Rather, he stated, "Defense counsel may assume that any specific request which is not answered is either not discoverable or the information requested is not available."

On May 8, 2000, one week before the appellant's trial, the prosecutor sent to defense counsel a letter notifying him that, "[a]s I had advised you earlier," the State would be calling Officer Daniel A. Rosales to testify as an expert witness. The letter arrived in defense counsel's office on May 9 and contained a brief description of Rosales' proposed testimony. On May 10, 2000, defense counsel filed a motion in limine asking that the trial court order the prosecutor to refrain at trial from referring to Rosales' testimony pending a hearing to determine its admissibility.

On May 16, 2000, the second day of the appellant's trial, the trial court conducted a jury-out hearing to address the admissibility of Rosales' testimony. During the jury-out hearing, Rosales indicated that he had been contacted by a DEA agent concerning the appellant's case approximately two or three weeks prior to trial and had first spoken with the prosecutor approximately one and one-half weeks prior to trial.[10] Moreover, Rosales communicated to the trial court the substance of his proposed testimony. In addition to the testimony summarized earlier in this opinion, Rosales indicated that he would testify that he had never encountered a drug courier who was unaware that he was transporting contraband.

The parties' arguments before the trial court were substantially similar to their positions in this appeal. We additionally note defense counsel's explanation to the trial court for his failure to request a continuance due to the timing of the State's notice concerning Rosales'

---

[10]Similarly, Rosales later testified before the jury that he had first spoken with the prosecutor at most one and one-half or two weeks prior to trial, but he was unsure of the precise time.

testimony. Specifically, defense counsel asserted, "My client has been sitting in jail since May 9th. His family flew in from Los Angeles."

The trial court concluded that defense counsel had waived any objection to the timing of the State's notice by proceeding to trial without requesting a continuance. Moreover, the court ruled that Rosales could testify as an expert in the field of "drug operations, modus operandi," observing,

> [T]he main issue is . . . is the probative value [of Rosales' testimony] outweighed by the prejudicial effect to Mr. Garcia? And, I think to some degree it is; that is, to the issues about . . . Officer Rosales's . . . . the proffered testimony of Officer Rosales gave about he's never interviewed anyone that did not know that they were transporting drugs, crosses the line in terms of becoming speculative in the Court's opinion.
>
> But I do think his proffer concerning the drug organizations, the hierarchy of drug organizations, mules, transporters, whatever you want to call them, the fact that they're trusted and paid for transportation - - for transporting illegal substances, and the reasons why he would think that they would know are areas that would substantially assist this jury in determining an issue in this case; that, is, did Mr. Garcia knowingly possess this? Now, [Rosales has] already said, and General Zimmermann said, that he does not have any information about Mr. Gar[ci]a in particular; but, that in and of itself does not make it inadmissible. I mean, he can in general . . . as I've stated, describe the reasons why a transporter would know without . . . eliciting - - the State eliciting through him that no one he's ever interviewed did not know. I mean, I think the areas about the value of the substance . . . and, it goes to the weight in terms of whether that's Houston or LA or Nashville or Georgia. Uh - - but, the value - - uh - - as I've already stated, the hierarchy, in general, and using people that they trust . . . and getting paid . . . and, that - - that general testimony about what a mule does [are admissible].

**ii.**

We first address the appellant's complaint concerning the timing of the State's notice to defense counsel that Rosales would testify at the appellant's trial. The appellant apparently relies wholly upon Tenn. R. Crim. P. 12(d), which provides:

Notice by the State of Intention to Use Evidence:

(1) At the Discretion of the State. - At the arraignment or as soon thereafter as is practicable, the state may give notice to the defendant of its intention to use specified evidence at trial in order to afford the defendant an opportunity to raise objections to such evidence prior to trial under subdivision (b)(3) of this rule.

(2) At the Request of the Defendant. - At the arraignment or as soon thereafter as is practicable, the defendant may, in order to afford an opportunity to move to suppress evidence under subdivision (b)(3) of this rule, request notice of the state's intention to use . . . any evidence which the defendant may be entitled to discover under Rule 16 . . . .

Notwithstanding the appellant's reliance upon the above rule, we note our supreme court's observation in State v. Cook, 9 S.W.3d 98, 101 (Tenn. 1999)(quoting United States v. Barletta, 644 F.2d 50, 54 (1st Cir. 1981)), that "'[a]t least as used in 12(b), . . . [m]otions to suppress are . . . "objections to evidence on the ground that it was illegally obtained", including "evidence obtained as a result of an illegal search" and "other forms of illegality such as the use of unconstitutional means to obtain a confession."'" Accordingly, because Rosales' testimony did not comprise illegally obtained evidence, Tenn. R. Crim. P. 12(d) is irrelevant to the resolution of this issue. Moreover, assuming the applicability of Tenn. R. Crim. P. 12(d), Tenn. R. Crim. P. 16 does not authorize pretrial discovery of the names and addresses of State's witnesses. State v. Harris, 839 S.W.2d 54, 69 (Tenn. 1992); State v. Martin, 634 S.W.2d 639, 643 (Tenn. Crim. App. 1982); State v. Jimmy Clyde Jones, No. 02C01-9703-CC-00120, 1997 WL 777077, at *8 (Tenn. Crim. App. at Jackson, December 18, 1997).

Rather, the pertinent authority is Tenn. Code Ann. § 40-17-106, which statute the appellant relied upon in the trial court but largely and inexplicably ignores on appeal, thereby waiving any reliance thereon. Tenn. R. App. P. 27(a)(7); Tenn. Ct. of Crim. App. Rule 10(b). Notwithstanding waiver, the appellant is not entitled to relief under Tenn. Code Ann. § 40-17-106. That statute provides that "[i]t is the duty of the district attorney general to endorse on each indictment or presentment, at the term at which the same is found, the names of such witnesses as the district attorney general intends shall be summoned in the cause." Id. The statute is directory rather than mandatory and does not necessarily disqualify from testifying a witness whose name has been omitted from the indictment. Harris, 839 S.W.2d at 69. Rather, our supreme court has indicated that a defendant is not entitled to relief absent a showing of prejudice, bad faith, or undue advantage. Id.; see also State v. Allen, 976 S.W.2d 661, 667 (Tenn. Crim. App. 1997); State v. Kendricks, 947 S.W.2d 875, 883 (Tenn. Crim. App. 1996); State v. Joel Guilds, No. 01C01-9804-CC-00182, 1999 WL 333368, at *3 (Tenn. Crim. App. at Nashville, May 27, 1999). Specifically with respect to prejudice, "'it is not the prejudice which resulted from the witness' testimony but the prejudice which resulted from the defendant's lack of notice which is relevant.'" Kendricks, 947 S.W.2d at 883. The determination of whether a witness omitted from the indictment should testify lies within the sound discretion of the trial court. Allen, 976 S.W.2d at 667; Kendricks, 947 S.W.2d at 883.

We cannot conclude that the trial court abused its discretion in the instant case. As noted by the State, the appellant was aware for at least six days prior to trial that Rosales intended to testify. Moreover, nothing in the record disputes the prosecutor's reference in his May 4, 1999 letter to a prior discussion with defense counsel concerning Rosales' testimony. Significantly, the appellant has failed to state what more he could or would have done if he had been provided Rosales' name at an earlier date, and he therefore demonstrates neither any prejudice suffered by himself nor any undue advantage enjoyed by the State. See, e.g., State v. Hutchison, 898 S.W.2d 161, 170-171 (Tenn. 1994). We also agree with the State that the appellant's failure to request a continuance must be weighed in the balance against the exclusion of Rosales' testimony. See, e.g., Allen, 976 S.W.2d at 667. In this regard, we disagree with the appellant that "it is beyond belief" that the prosecutor did not decide to use Rosales' testimony well before issuing the appellant notice. Both the trial court and the parties remarked upon the unusual nature of Rosales' testimony. It is certainly possible that the idea to call Rosales as a witness was the result of brainstorming occurring in the final weeks prior to trial and required some degree of reflection prior to approval. In short, the appellant has simply failed to carry his burden of demonstrating his entitlement to relief. In any event, the appellant's true complaint lies with the content of Rosales' testimony, an issue we now turn to address.

### iii.

In State v. Coley, 32 S.W.3d 831, 834 (Tenn. 2000), our supreme court observed that the following principles guide a trial court's determination of whether to admit expert testimony relating to scientific, technical, or other specialized knowledge:

> First, the evidence must be relevant to a fact at issue in the case. Tenn. R. Evid. 401, 402. Second, the expert must be qualified by specialized knowledge, skill, experience, training, or education in the field of expertise, and the testimony in question must substantially assist the trier of fact to understand the evidence or determine a fact in issue. Tenn. R. Evid. 702; [McDaniel v. CSX Transp., Inc., 955 S.W.2d 257, 265 (Tenn. 1997)]; State v. Begley, 956 S.W.2d 471, 475 (Tenn. 1997). Finally, when the expert witness offers an opinion or states an inference, the underlying facts or data upon which the expert relied must be trustworthy. Tenn. R. Evid. 703; McDaniel, 955 S.W.2d at 265.

The admissibility of expert testimony rests within the sound discretion of the trial court. Coley, 32 S.W.2d at 833; see also State v. William R. Stevens, No. M1999-02067-CCA-R3-DD, 2001 WL 579054, at * 15 (Tenn. Crim. App. at Nashville, May 30, 2001).

On appeal, the appellant challenges neither Rosales' qualification as an expert nor the trustworthiness of the underlying facts or data upon which he relied. Rather, the appellant simply asserts that Rosales' testimony was irrelevant and, rather than substantially assisting the trier of fact to understand the evidence or determine a fact in issue, posed a significant danger of unfair

prejudice. For purposes of clarity, we also emphasize that the challenged testimony does not appear to encompass Rosales' testimony concerning the street value of the methamphetamine, nor would the appellant prevail on that basis. See, e.g., State v. Matthews, 805 S.W.2d 776, 782 (Tenn. Crim. App. 1990). Instead, the challenged testimony comprises Rosales' testimony concerning the practices of criminal organizations dealing in illegal drugs.

In support of his challenge, the appellant seeks to analogize Rosales' testimony to expert testimony concerning the reliability of eyewitness testimony. Our supreme court addressed the admissibility of the latter in Coley, 32 S.W.3d at 833-838. The court concluded that "general and unparticularized expert testimony concerning the reliability of eyewitness testimony, which is not specific to the witness whose testimony is in question, does not substantially assist the trier of fact." Id. at 838. The court based its decision on the following rationales: (1) expert testimony concerning eyewitness identification simply offers generalities and is not specific to the witness whose testimony is in question; (2) the subject of the reliability of eyewitness identification is within the common understanding of reasonable persons; and (3) such testimony may mislead and confuse the jury, resulting in the jury's abandonment of its responsibility as fact-finder and its adoption of the judgment of the expert. Id. at 837-838.[11]

We agree with the appellant that our supreme court's decision in Coley has some bearing upon the instant case. Like the expert testimony at issue in Coley, Rosales' testimony concerning the care with which organizations dealing in illegal drugs select their drug couriers and the method by which the courier's fee is calculated was of a general nature and was not specific to this case. Indeed, the connection between the expert testimony and the case at hand is more attenuated than that in Coley as, even assuming Rosales' generalizations concerning criminal organizations can be applied with confidence to any one organization, the State did not introduce evidence, nor bring any charges, concerning the appellant's participation in such an organization. Cf. State v. Michael F. Marasciello, No. M1997-00049-CCA-R10-CD, 2000 WL 1130126, at **19-20 (Tenn. Crim. App. at Nashville, July 28, 2000), perm. to appeal denied, (Tenn. 2000)(publication pending). Accordingly, contrary to the State's position on appeal, whether such organizations would entrust large quantities of illegal drugs to an unwitting courier does not make the appellant's

---

[11]Other Tennessee cases that are closely analogous to Coley include the following: In State v. Ballard, 855 S.W.2d 557, 561-562 (Tenn. 1993), the supreme court held that expert testimony concerning the profile of a sexually abused child was inadmissible for the purpose of proving that the victim had in fact been sexually abused. More recently, in State v. Smith, 42 S.W.3d 101, 110-112 (Tenn. Crim. App. 2000), perm. to appeal denied, (Tenn. 2001), this court held that expert testimony concerning the general behavior of other criminal suspects during questioning by police had no value in assessing the credibility of the defendant's statements to the police. Similarly, in Stevens, No. M1999-02067-CCA-R3-DD, 2001 WL 579054, at * 20, this court held that the State could not establish that the motive of the perpetrator was "sexual assault brought about by a precipitating stressor" by introducing expert testimony comparing the crime scene at issue to the "typical crime scene" in which "sexual assault brought about by a precipitating stressor" was the motivation. See also State v. Ashburn, 914 S.W.2d 108, 111-113 (Tenn. Crim. App. 1995). But cf. State v. William Aubrey Trotter, No. 01C01-9701-CR-00019, 1998 WL 75423, at *4 (Tenn. Crim. App. at Nashville, February 24, 1998), and id. at * 5 (Tipton, J., concurring).

knowledge of the methamphetamine any more or less probable. Tenn. R. Evid. 401. In short, the testimony was irrelevant. Cf. United States v. Cordoba, 104 F.3d 225, 229-230 (9th Cir. 1997). Moreover, even assuming the appellant's participation in a criminal organization, we are not convinced that the jury required the testimony of an expert to conclude that such an organization would not entrust 1.8 million dollars worth of methamphetamine to an unwitting courier. Finally, notwithstanding the disputed testimony's lack of probative value and defense counsel's efforts on cross-examination to clarify Rosales' lack of any knowledge specifically pertaining to the appellant, the testimony created a danger of unfair prejudice, confusion of the issues, or misleading the jury as it unavoidably left the jury with the impression that the appellant was a member of a large-scale criminal organization. Tenn. R. Evid. 403.

While we would not characterize the State's case against the appellant as insubstantial, the credibility of the appellant or lack thereof was undoubtedly a critical component of the jury's resolution in favor of the State. Particularly in the context of Kohl's inadmissible testimony concerning the appellant's statements during his illegal detention, we cannot conclude with confidence that the introduction of Rosales' testimony did not affect the judgment. Tenn. R. Crim. P. 52(a); see also Tenn. R. App. P. 36(b). Accordingly, we must reverse the appellant's conviction and remand this case for a new trial.

### C. Denial of Motion for Judgment of Acquittal

The appellant next asserts that the trial court erred in denying his motion for judgment of acquittal under Tenn. R. Crim. P. 29(C). When a trial court is presented with a motion for a judgment of acquittal, the court's sole concern is the legal sufficiency, as opposed to the weight, of the evidence. State v. Blanton, 926 S.W.2d 953, 957 (Tenn. Crim. App. 1996); State v. Eric Terrell Glover, No. W2000-01278-CCA-R3-CD, 2001 WL 1078279, at *5 (Tenn. Crim. App. at Jackson, September 14, 2001). Of course, when a motion for judgment of acquittal is a component of a motion for new trial, Tenn. R. Crim. P. 33(f) authorizes the trial court to grant a new trial if it disagrees with the jury about the weight of the evidence. The accuracy of a trial court's "thirteenth juror" determination, however, is not subject to appellate review. State v. Moats, 906 S.W.2d 431, 435 (Tenn. 1995). In other words, once the trial court approves the jury's verdict as the thirteenth juror, appellate review is limited to the legal sufficiency of the evidence; that is, whether any "rational trier of fact" could have found the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Tenn. R. App. P. 13(e).

The standard of legal sufficiency is predicated upon the principle that all factual issues raised by the evidence, including questions concerning the credibility of witnesses and the weight and value to be given the evidence, are resolved by the trier of fact. State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990). Consequently, on appeal, we afford the State as the prevailing party the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). This standard applies to

convictions based upon direct evidence, circumstantial evidence, or both. State v. Carruthers, 35 S.W.3d 516, 557 (Tenn. 2000). Thus, as in the case of direct evidence, the weight to be given circumstantial evidence and "'[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958).

The State in this case was required to prove beyond a reasonable doubt that the appellant knowingly possessed methamphetamine with intent to deliver and that the methamphetamine weighed one thousand grams or more. Tenn. Code Ann. § 39-17-417(a)(4) and (j)(10)(1997). The legislature has defined the term "deliver" or "delivery" as "the actual, constructive, or attempted transfer from one person to another of a controlled substance, whether or not there is an agency relationship." Tenn. Code Ann. § 39-17-402 (6) (1997). Moreover, in State v. Transou, 928 S.W.2d 949, 955-956 (Tenn. Crim. App. 1996)(citations omitted), this court elaborated upon the meaning of the term "possession" used in Tenn. Code Ann. § 39-17-417:

> "The term possession . . . embraces both actual and constructive possession. Before a person can be found to constructively possess a drug, it must appear that the person has 'the power and intention at a given time to exercise dominion and control over . . . [the drugs] either directly or through others.' In other words, 'constructive possession is the ability to reduce an object to actual possession.' . . .

See also State v. Ross, 49 S.W.3d 833, 845-846 (Tenn. 2001).

The State may prove a criminal offense by the use of circumstantial evidence alone. State v. Tharpe, 726 S.W.2d 896, 899-900 (Tenn.1987); State v. Knight, 969 S.W.2d 939, 941 (Tenn. Crim. App. 1997). However, before a jury may convict a defendant of a criminal offense based upon circumstantial evidence alone, the facts and circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971); see also State v. Gregory, 862 S.W.2d 574, 577 (Tenn. Crim. App. 1993). "In summary, a conviction for a criminal offense cannot be predicated solely upon conjecture, guess, speculation, or a mere possibility that [the accused] may be guilty." Transou, 928 S.W.2d at 955.

Thus, this court has held that the mere presence of an accused in an area where drugs are discovered or mere association with a person who does in fact control the drugs or property where the drugs are discovered is not, alone, sufficient to support a finding that the accused constructively possessed the drugs. Id. at 956. However, a defendant's ownership *or control over* a vehicle in which the contraband is secreted will support a finding of constructive possession and, hence, knowing possession. Ross, 49 S.W.3d at 846; State v. Brown, 915 S.W.2d 3, 7-8 (Tenn. Crim. App. 1995); State v. Johnny Bernard Jones, No. 02C01-9801-CC-00026, 1998 WL 886567, *2 (Tenn. Crim. App. at Jackson, December 21, 1998). Moreover, a defendant's knowledge of the

drugs may be inferred from the large quantity or value of the drugs. See, e.g., United States v. Ocampo, 937 F.2d 485, 488 (9th Cir. 1991). Similarly, Tenn. Code Ann. § 39-17-419 (1997) provides that "[i]t may be inferred from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance . . . w[as] possessed with the purpose of selling or otherwise dispensing."

Again, the appellant in this case was the driver and sole occupant of a vehicle in which approximately eighteen thousand grams of methamphetamine were secreted. According to the appellant, a "friend" had loaned him the vehicle approximately three days prior to his arrest because the friend was going to Mexico on vacation for one month. The appellant acknowledged that he had exclusive possession of the vehicle. He also acknowledged that his friend was aware of his planned trip to Georgia to visit his cousin and, moreover, knew his cousin. However, the appellant denied that his friend instructed him to take the car to Georgia and denied any awareness of the drugs in the car. Nevertheless, during his consensual encounter with Officer Kohl following the traffic stop, the appellant displayed nervousness only when questioned concerning the possible presence of illegal drugs in the vehicle. Additionally, expert testimony established that, in some markets, the methamphetamine found in the vehicle was worth approximately 1.8 million dollars. A reasonable jury could have concluded that it was utterly implausible that a drug smuggler would entrust the appellant with a vehicle containing 1.8 million dollars worth of methamphetamine for one month without informing the appellant of its contents and without any instructions concerning the appellant's use of the vehicle, in the vague hope that the appellant would either successfully convey the drugs to the appropriate destination or otherwise hold the drugs in safety until the owner's return. This issue is without merit.

## D. Jury Instructions

Finally, the appellant complains concerning the trial court's rejection of his proposed jury instruction on the lesser-included offense of criminal responsibility for facilitation of a felony and his proposed instruction that a defendant's mere association with a person who does in fact control the drugs or property where the drugs are discovered is insufficient to establish the defendant's constructive possession of the drugs. With respect to the facilitation instruction, the appellant asserts that, pursuant to State v. Burns, 6 S.W.3d 453, 467 (Tenn. 1999), facilitation is "clearly" a lesser-included offense of the charged offense, and the instruction was warranted by the State's theory at trial that the appellant was a drug courier working on behalf of a criminal organization. With respect to the instruction on "mere association," the appellant relies upon Transou, 928 S.W.2d at 956, and asserts that the instruction was warranted in light of undisputed evidence that the appellant did not own the vehicle in which the methamphetamine was discovered.

The State responds that the trial court properly refused to instruct the jury on facilitation because, "[t]o be guilty of facilitation, the defendant would have to know the drugs were in the car. If he knew the drugs were in the car and he drove the car, then he transported the drugs and is guilty of the charged offense." As to the proposed instruction on mere association, the State

-38-

asserts that the substance of the instruction was inherent in the court's instruction on constructive possession.

**i.**

We agree with the appellant that facilitation is a lesser-included offense of possession of a controlled substance with intent to deliver. Burns, 6 S.W.3d at 467; see also State v. Ely, 48 S.W.3d 710, 720 (Tenn. 2001)(noting that, although defendant was not specifically charged with criminal responsibility for the conduct of another, "part (c) of the Burns test expressly states that facilitation of the charged offense is a lesser-included offense of the charged offense"), cert. denied, __ U.S. __, 122 S. Ct. 408 (2001). Accordingly, the trial court was obligated to instruct the jury on facilitation if there existed evidence that reasonable minds could accept as to the lesser-included offense and this evidence was legally sufficient to support a conviction of the lesser-included offense. Burns, 6 S.W.3d at 469. Significantly, "[w]hether sufficient evidence supports a conviction of the charged offense does not affect the trial court's duty to instruct on the lesser offense if evidence also supports a finding of guilt on the lesser offense." Id. at 472; see also State v. Bowles, 52 S.W.3d 69, 80 (Tenn. 2001). But cf. State v. Doney D. Miles, No. W2000-02587-CCA-R3-CD, 2001 WL 1078281, at **4-5 (Tenn. Crim. App. at Jackson, September 14, 2001). In determining whether the evidence warranted an instruction on facilitation, the court was required to "view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence." Burns, 6 S.W.3d at 469.

"A person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under Tenn. Code Ann. § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403 (a)(1997). Thus, facilitation requires the absence of any "intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense." Tenn. Code Ann. § 39-11-402(2) (1997).

We must agree with the State that there is no evidence in the record that the appellant was criminally responsible for facilitating the commission of the charged offense by another. Again, the appellant was charged with possession of methamphetamine with intent to deliver. Arguably, as the appellant was the driver and sole occupant of the vehicle transporting the drugs to Georgia, there was no one to whom he could furnish substantial assistance in committing the offense of felony possession of a controlled substance. However, we note that a person may exercise constructive possession through another. Transou, 928 S.W.2d at 955-956. At least in the context of possession of stolen property, we have observed that a person

> "'has such constructive possession where the goods are in the possession of someone over whom he has for the time being direction and control, such as his authorized servants or agents, . . . so that the goods will be forthcoming when he orders, and also where by his direction the goods are deposited in a place subject to his control, or

-39-

where they are concealed on his premises by others with his knowledge or consent.'"

Sullivan v. State, 513 S.W.2d 152, 154 (Tenn. Crim. App. 1974). Nevertheless, assuming that the owner of the vehicle or someone other than the appellant had constructive possession of the drugs through the appellant, that the appellant was aware of the person's intent to deliver the drugs, and that the appellant furnished substantial assistance in the commission of the offense, no reasonable juror could have believed that the appellant did not intend "to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense." Tenn. Code Ann. § 39-11-402(2). Indeed, assuming the appellant's knowledge of the drugs, the appellant possessed no other reason for using the vehicle in question in order to drive to Georgia other than to assist in the commission of the offense or, at a minimum, benefit from the "results of the offense" by virtue of avoiding the use of his own vehicle for the lengthy trip. Accordingly, no instruction on the lesser-included offense of facilitation was warranted. See, e.g., Ely, 48 S.W.3d at 724.

**ii.**

As to the appellant's proposed instruction on "mere association," a defendant has a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Accordingly, trial courts "should give a requested instruction if it is supported by the evidence, embodies a party's theory, and is a correct statement of the law." State v. Phipps, 883 S.W.2d 138, 150 n.20 (Tenn. Crim. App. 1994). However, trial courts need not give requested instructions if the substance of the instructions is covered in the general charge. State v. Zirkle, 910 S.W.2d 874, 892 (Tenn. Crim. App. 1995). We must agree with the State that "the substance of the requested instruction is inherent in the court's instruction that constructive possession requires that the defendant have both the power and intention to exercise control over an object" and in the court's instruction on circumstantial evidence. State v. Johnny Wayne Tillery, No. 01C01-9506-CC-00182, 1998 WL 148326, at *1 (Tenn. Crim. App. at Nashville, March 30, 1998); State v. Milton Jerome Johnson, No. 139, 1991 WL 35752, at *2 (Tenn. Crim. App. at Jackson, March 20, 1991).

**III.  Conclusion**

For the foregoing reasons, we reverse the judgment of the trial court and remand this case for a new trial.

_____
NORMA McGEE OGLE, JUDGE